**FEDERAL SAVINGS AND LOAN IN- SURANCE CORPORATION, a corporation, Plaintiff,**

v.

**Sidney HUTTNER, Rose Huttner, Irving Voliner and Gertrude Voliner, Defendants.**

**No. 66 C 287.**

United States District Court
N. D. Illinois, E. D.
March 14, 1967.

Thomas R. Mulroy, Mark Crane, W. L. Heubaum Hopkins, Sutter, Owen, Mulroy, Wentz & Davis, Chicago, Ill., Kenneth E. Scott, Gen. Counsel, Alan J. Moscov, Deputy Gen. Counsel, Max Wilfand, Asst. Gen. Counsel, William R. Granik, Federal Savings & Loan Insurance Corp., Washington, D. C., of counsel, for plaintiff.

Milton J. Kolman, of Kolman, Cohn & Kier, Chicago, Ill., for defendants.

## OPINION

WILL, District Judge.

Plaintiff, Federal Savings and Loan Insurance Corporation ("FSLIC"), has brought this declaratory judgment action in which it seeks a determination that it is not liable to pay defendants, and the class they represent, the amount of a dividend declared by the directors of Marshall Savings and Loan Association ("Marshall"). Marshall has, since July 3, 1951, been an FSLIC-insured institution under Title IV of the National Housing Act ("NHA").

On April 8, 1965 Marshall was in "default" within the meaning of Section 401 (d) of the NHA, 12 U.S.C. § 1724(d), at which time plaintiff, pursuant to Section 405(a) and (b) of the NHA, 12 U.S.C. § 1728(a) (b), became obligated to members of Marshall for the full withdrawal or repurchasable value of their accounts up to an amount not in excess of $10,000 for each member.[1]

The dividend, which is the subject matter of this law suit, was declared by Marshall's directors on December 15, 1964, to be credited and payable as of the opening of business on December 31, 1964. Prior to the opening of business on December 31, however, the Director of Financial Institutions of the State of Illinois, Joseph E. Knight ("Knight"), took custody of the books, records, accounts and assets of Marshall. His action followed a series of events which are detailed below. Knight appointed a custodian and ultimately, on April 8, 1965, appointed a receiver. By virtue of the appointment of a receiver for the pur-

---

1. Section 405(a), as of the time of default herein, read as follows: "Each institution whose application for insurance under this subchapter is approved by the Corporation shall be entitled to insurance up to the full withdrawal or repurchasable value of the account of each of its members and investors (including individuals, partnerships, associations, and corporations) holding withdrawable or repurchasable shares, investment certificates, or deposits, in such institution; except that no member or investor of any such institution shall be insured for an aggregate amount in excess of $10,000." 12 U.S.C. § 1728(a). As amended Oct. 16, 1966, Pub.L. 89–695, Title III §§ 302(b), 303(b), 80 Stat. 1055, 1056, it now provides insurance up to $15,000.

Section 405(b) reads as follows: "In the event of a default by any insured institution, payment of each insured account in such insured institution which is surrendered and transferred to the Corporation shall be made by the Corporation as soon as possible either (1) by cash or (2) by making available to each insured member a transferred account in a new insured institution in the same community or in another insured institution in an amount equal to the insured account of such insured member; *Provided*, That the Corporation, in its discretion, may require proof of claims to be filed before paying the insured accounts, and that in any case where the Corporation is not satisfied as to the validity of a claim for an insured account, it may require the final determination of a court of competent jurisdiction before paying such claim." 12 U.S.C. § 1728(b).

pose of liquidation, Marshall was in default.

Shortly after the default, a letter was sent to the insured Members of Marshall by the Director of the Federal Savings and Loan Association in which he stated that each insured member would receive the amount of his investment including dividends "which have been heretofore declared and credited to the books of the association" subject, of course, to the $10,000 limitation. Although the December dividend appeared on each of the individual account ledger cards as a memoed entry, it had not been posted to those cards, and, therefore, was not reflected in the Balance columns of the cards. The December dividend was not included by the Receiver in computing the withdrawal value of the accounts. Subsequent to April 19, 1965, FSLIC paid insurance to the Huttners and Voliners, and to all members of the class they represent, in amounts equal to the respective balances of their accounts as reflected in the Balance columns of the account ledger cards at Marshall. These amounts did not include the December dividend. Various members of the class which defendants represent demanded payment of the December dividend by the FSLIC, which refused their demands.

■ The parties have stipulated and the court agrees that the requirements of Rule 23 of the Federal Rules of Civil Procedure are satisfied here, and, therefore, that this is a class action within the meaning of that rule. The defendants, Huttners and Voliners, were insured Members of Marshall and represent the class consisting of all insured Members of Marshall: (a) who were insured Members on and immediately prior to its opening for business on December 31, 1964, (b) who were determined by FSLIC to be holders of withdrawal capital accounts in Marshall as of April 8, 1965, (c) who submitted claims for insurance to FSLIC, and (d) who received payment of less than $10,000 from FSLIC.

The class consists of approximately 20,000 persons, and we conclude that joinder of all its members is impracticable. We further conclude that there are questions of law common to the class, that the claims or defenses of the defendants are typical of the claims or defenses of the class, that the prosecution of separate actions against individual members of the class would create the risk of inconsistent or varying adjudications and that the defendants will fairly and adequately protect the interests of the class.[2]

Both sides have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. In addition, they have filed an extensive stipulation which the court adopts as the Findings of Fact. The court is in agree-

---

2. The Huttners and Voliners initially brought suit in this court against the FSLIC seeking a determination of the same rights which are the subject of controversy in this action. That suit was dismissed for want of jurisdiction. When the original suit was filed and when it was dismissed Rule 23 was generally construed not to permit the aggregation of claims in class actions which were "spurious" in order to meet the jurisdictional requirement of a sum in controversy in excess of $10,000. FSLIC moved to dismiss on the ground that the class was "spurious" and that the claims of the individual plaintiffs did not exceed $10,000. The court agreed, and the action was dismissed. Concurrently, however, FSLIC brought the instant action. Jurisdiction of the court is invoked pursuant to Section 1345 of the Judicial Code,

28 U.S.C. § 1345, which grants original jurisdiction to the district courts in all civil actions commenced by the United States or by any agency thereof which is expressly authorized to sue by Act of Congress. FSLIC is expressly authorized by Congress to sue, 12 U.S.C. § 1437(b), 1725. FSLIC brought this action so that notwithstanding the dismissal of the original suit, the question of its obligation to Members of Marshall would be adjudicated. It is interesting to note that Rule 23 has since been amended, effective July 1, 1966, and under the present rule the distinction between "true" and "spurious" class actions has been abolished. As indicated above, the parties and the court agree that this is a valid action against the class represented by Huttners and Voliners.

ment with the parties that there are no remaining questions of fact, and therefore no additional Findings are necessary. We are thus prepared to rule on the ultimate legal question presented herein, whether the FSLIC is obligated to pay the December dividend as part of its insurance coverage to persons in this class.

### DECLARATION OF THE DECEMBER DIVIDEND AND CUSTOMARY BUSINESS PRACTICES OF MARSHALL

Marshall's by-laws provide that profits may be apportioned quarterly so that in the ordinary course the dividends declared "may be in the hands of or available to shareholders on or before * * * and December 31." On December 15, 1964, the resolution declaring a dividend to be credited and payable as of the opening of business on December 31, was adopted by the Board of Directors.

The term "savings account" in a savings and loan association is known as a "Withdrawal Capital account." That term encompasses both "Optional" and "Full-Paid accounts." The former is a type of account where the holder makes a minimum initial payment of at least $1.00 upon issuance of the account and thereafter makes subsequent payments in such amounts and at such time as he may elect. This is the customary savings account. Full-Paid accounts are accounts where the holder makes a single payment in units of $100, upon issuance of the account. Such accounts are sometimes termed "Investment accounts."

Marshall customarily credited dividends to the accounts of holders of Optional accounts. Upon request, however, such holders would be paid their dividends by check. The holders of 1,329 of Optional accounts at Marshall had requested that their December dividend be paid by check. Checks, dated December 31, 1964 and totaling $97,946.29 were typewritten by Marshall and executed by the appropriate officer. These checks in the normal course would have been mailed on the 31st, and if cashed would have been drawn on Marshall's Regular account at the Chicago City Bank and Trust Company, the commercial bank at which Marshall maintained its regular checking and special dividend accounts. The checks were never mailed or otherwise delivered to the holders of such accounts.

All holders of Full-Paid accounts normally received their dividends by check. Marshall maintained a separate Dividend account at the Chicago City Bank for the payment of dividends on Full-Paid accounts and 2,825 such checks, dated December 31, 1964 and totaling $189,662.31 in amount, were written and executed, but, as above, these checks were neither mailed or otherwise delivered. In the normal course, Marshall would order the transfer of funds from its Regular account at the Chicago City Bank to its Dividend account on dividend day and a check would be drawn on its Regular account. No check was drawn on December 31. Without such a transfer, the balance in the Dividend account would always be insufficient to pay the dividends on Full-Paid accounts.

It was the practice of Marshall to compute some time in advance the amount expected to be paid as a dividend on both Optional and Full-Paid accounts. With respect to Optional accounts, the computation of the amount expected to be due on each Optional account for the quarter ending December 31, 1964 was made by Marshall at the same time the actual amount of the dividend for the quarter ending September 30, 1964 was added to the balance on the account ledger card. Thus the last dividend was posted and the anticipated next dividend was memoed to the account ledger card of each account. This might be done several days after the last dividend became due and payable, but the posting and memoing were always dated as of the dividend day or the next business day thereafter, but not later than the first of the next month.

Memorandum entries were changed by Marshall's accounting department whenever any activity (i. e., a deposit or with-

drawal took place in a Member's account, so that the estimated dividend would always be based upon the current balance of the account. Thus on dividend day, the most recent memorandum entry of dividend on any one account ledger card would become the actual amount of the dividend for the quarter then ending with respect to that account. On December 31, 1964, therefore, prior to the opening for business, all of the account ledger cards for Optional accounts displayed a memorandum entry of the anticipated December dividend.

Marshall also maintained a series of records called "Control Sheets." A "Sheet" summarized the accounting data on a group of account ledger cards. Thus, the Control Sheets for all groups of all accounts summarized the next quarter's anticipated dividend, in a column entitled "Anticipated Dividend," which information also appeared, as noted above, as a memorandum entry on the individual account ledger cards. On dividend day it was Marshall's custom to post the actual amount of the dividend attributable to Optional accounts as a "Deposit" to the Control Sheets for Optional accounts, and to post the actual amount of the dividend attributable to Full-Paid accounts as a "Withdrawal" to the Control Sheets for Full-Paid accounts.

It was common for Members to present their passbooks to a teller on dividend day and request that the amount of the dividend be posted on their passbooks. The amount so posted on the passbook by a teller would not be posted on the Member's account ledger card at the same time. As explained above, the final posting would take place later. However, the teller, when presented the passbooks, made a penciled notation "BP" (meaning passbook posted on the Member's account ledger card) in or adjacent to the memorandum column immediately after the anticipated dividend. Of course, on dividend days Members holding Optional accounts could present their passbooks to Marshall's tellers, have the dividend posted thereon, and immediately thereafter withdraw the amount of the dividend, al-

though it had not yet been posted to their individual account ledger cards but rather still appeared on the cards as a memorandum entry only.

### THE CUSTODIAL TAKING OF MARSHALL

On October 31, 1964, Knight, the Illinois Director of Financial Institutions, informed representatives of Marshall that on the basis of information then available, it appeared that Marshall's capital was impaired. On November 4, Knight instructed the directors of Marshall by letter to obtain approval from him or his agents for any disbursement of funds in excess of $5,000.

On November 27, Knight notified the proposed new directors of Marshall that on the basis of preliminary figures furnished by Stangle and Lauber (certified public accountants who, at the request of Knight, conducted a special examination of Marshall's condition as of September 30, 1964) the capital of Marshall was impaired and Marshall would not be allowed to continue conducting its business unless new capital was contributed to cure the impairment.

On December 29, Knight received the report of Stangle and Lauber on the condition of Marshall as of September 30. Also on that date, representatives of Marshall affirmed to Knight their intention to pay the December dividend. Knight thereupon determined that an emergency existed at Marshall and issued an order on December 29 to be effective at 9:00 A.M. December 31, 1964, taking control of the books, records, accounts and assets of Marshall pursuant to Sections 7–8 and 7–9 of the Illinois Savings and Loan Act ("I.S.L.A."), 32 Ill.Rev.Stat. §§ 848, 849.

Under Section 7–10 of the I.L.S.A., 32 Ill.Rev.Stat. § 850, the Director of Financial Institutions, upon lawfully taking custody of an association, is given the power "to operate the business of the association, except as limited by other subsections of this section" (which deal with such things as making investments and borrowing money) ; *exercising for*

*that purpose all of the rights, powers, and privileges possessed by the officers and directors, liquidators, or trustees."* (emphasis added)

On December 29, Knight also appointed Paul M. Miller ("Miller") as custodian of Marshall effective 9:00 A.M. on the 31st. Miller ordered the locks changed but did not lock Marshall's exterior doors or otherwise refuse Members admittance to Marshall's premises. He issued orders, however, to all of Marshall's personnel to permit no business transactions of any kind involving Members' accounts on or after the opening of business at 9:30 A.M. including, but not limited to the withdrawal of or acceptance of deposits.

Immediately upon taking custody, Miller issued oral orders to Marshall's personnel to (a) not order the transfer of funds from its Regular Account to its Dividend Account at the Chicago City Bank; (b) not mail out or otherwise deliver any of the checks in payment of dividends which had already been typewritten and signed; and (c) not make general journal entries or post any account ledger cards or other ledgers or Control Sheets to reflect payment of the December dividend.

While both Miller and his assistant Albert Claessens ("Claessens") specified that no withdrawals or deposits were to be disbursed or accepted, they gave no specific instructions with respect to posting the December dividend to the balances in Members' passbooks. Shortly after Marshall opened for business on the 31st, one of the tellers told the head teller that a Member had asked whether the December dividend might be posted on his passbook. The teller referred the question to Miller, who gave permission to post the December dividend on the passbooks of Members so requesting.

On the morning of December 31, 195 members holding Optional accounts appeared in person at Marshall and had the December dividend posted on their passbooks. About 10:45 on that morning, Claessens came down from the second floor of Marshall where he had been

working and noted that activity was taking place at the teller's windows on the main floor. Upon investigation, he learned that the tellers were posting the December dividend on passbooks presented to them. He immediately ordered the head teller and all other tellers to stop making such postings. Claessens then went to Miller's office and advised him of the postings. Miller, countermanding his previous authorizations, ordered that the posting should be stopped, to which Claessens replied that he had already stopped it.

After 11:00 A.M., it was brought to Miller's and Claessen's attention that on December 29, the December dividend had been entered on the passbooks of fifty-eight Members who had mailed in their passbooks to Marshall. Although the entries were made on the 29th, they were dated December 31. Miller and Claessens thereupon ordered that such credits be rescinded by physically lining out and marking "void" the postings on the passbooks, and this was done to all fifty-eight passbooks on December 31.

On and after December 31, business was carried on by Marshall to the extent that Knight or his agents, Miller and Claessens (a) accepted mortgage payments; (b) honored certificates previously given to Members of Marshall entitling the Member to receive a gift or bonus of merchandise as a reward for having deposited a certain sum of money to his account; (c) paid Marshall employees their salaries; (d) paid taxes and utility bills; (e) conducted litigation such as mortgage foreclosure actions; (f) conducted periodic accountings, and (g) permitted Marshall's Board of Directors to conduct its meetings on Marshall's premises.

### PAYMENT OF INSURANCE TO MARSHALL'S MEMBERS

On April 8, 1965, Knight, pursuant to the powers granted him by Section 10–1 of the I.S.L.A., 32 Ill.Rev.Stat. § 921, appointed John R. Henson as Receiver for Marshall. On April 9, the Receiver took possession of and title to the books, records and assets of Marshall, as authorized

by Section 10–1. As noted earlier Marshall was, upon the appointment of a Receiver, in default under the National Housing Act and FSLIC was obligated to take the action prescribed in Section 405(b) of the Act.

On April 19, 1965 the Receiver for Marshall made the following certification to the FSLIC:

"I John R. Henson, Receiver for Marshall Savings and Loan Association by Albert Claessens, Assistant to the Receiver, and authorized by the Receiver to execute and discharge all powers afforded the Receiver in liquidation pursuant to and in accordance with Chapter 32, Sections 701 et seq., in the interest of permitting the Federal Savings and Loan Insurance Corporation to implement and cause prompt payment of insured accounts of the insured members of Marshall Savings and Loan Association, do hereby represent and state that:

"1. The ledger cards aggregating 27,-055 and representing share capital of $87,052,725.62 made available to the Federal Savings and Loan Insurance Corporation, are the ledger cards of Marshall Savings and Loan Association at the time of my assuming duties as Receiver. I have no knowledge that would cause me to question the accuracy of these cards as setting forth the liability of the Association, as indicated on the cards, to the insured members, nor do I have any affirmative knowledge as to the accuracy of the cards."

The memoed entry representing the December dividend was not included by the Receiver in computing the aggregate withdrawal value of $87,052,725.62 as of April 9, 1965. Subsequent to April 19, 1965 FSLIC paid insurance in amounts equal to the respective balances on the account ledger cards as reflected in the Balance columns. The December dividend was not included.

## LEGALITY OF THE DECEMBER DIVIDEND AND THE RESERVE REQUIREMENTS

There is no dispute, and indeed the parties have stipulated, that during the period September 29, 1964 through and including December 31, 1964: (a) Marshall's assets were over-valued; (b) Marshall's reserves and deferred income were insufficient in amount to absorb the over-valuation; (c) because of the conditions set forth in (a) and (b), Marshall's capital was impaired in that there were insufficient assets to pay the holders of withdrawable capital accounts the full balances thereof; (d) Marshall was insolvent.

It is also agreed that the reserves required by both the National Housing Act and the Illinois Savings and Loan Act prior to the paying of dividends were not kept by Marshall. By virtue of the insolvency and the failure to meet the reserve requirements, there is no question but that the December dividend was illegal. The parties, however, differ on the effect of the illegality vis a vis the obligation of the FSLIC to pay insurance. The stipulation, which has been adopted by the court as its Findings of Fact, details the reserve requirements provisions and Marshall's status with respect thereto, and we need not dwell on them here. We do note, however, that as a prerequisite to the issuance of insurance by the FSLIC, Marshall filed with the Federal Board on June 7, 1950, its application for insurance of accounts, in which it agreed to provide adequate reserves satisfactory to the FSLIC in accordance with the Regulations.

## CONCLUSION

■ This is a case of first impression in that there are no reported decisions involving a suit seeking the payment of dividends from FSLIC as an insurer in a situation where an insured institution has been involuntarily liquidated. For the reasons set forth below, we conclude that under the facts of this case, the FSLIC was not obligated to pay the amount of the December dividend under

its insurance coverage of the accounts at Marshall and the FSLIC properly refused payment of the amount of the dividend.

Despite the varied arguments presented by both sides the ultimate question in this case is the proper construction of the statutes and regulations that govern FSLIC's obligations. Section 405(a) of the NHA provides that insurance coverage extends to the full "withdrawal value" of the accounts. The FSLIC regulations define the "account of an insured member" as "the total amount credited" to a Member's account. 12 C.F.R. § 561.5.[3] Upon default the withdrawal value is to be "determined from the security contract and from the books and records of the insured institution as of the last dividend or apportionment date." 12 C.F.R. § 564.1.[4] In short, the insurance obligation is determined by the withdrawal value of accounts as reflected by the books and records of the institution.

The FSLIC certainly cannot alter the books and records it receives from the Receiver. It is, however, specious to contend, as plaintiff apparently does, that the December dividend does not appear on the books and records of Marshall as they were turned over to the FSLIC, for the dividend was reflected as a memorandum entry on each account ledger card. Thus, we think, the plaintiff begs the question when it states that the Receiver's statement of withdrawal capital did not include the amount of the December dividend. The question is not whether the dividend was on the books but how it was on the books, i. e., whether or not it was credited to the accounts, thus making it part of the withdrawal value.

An examination of the actions taken by Knight leads us to the inescapable conclusion that in fact the dividend was never "credited" to the books and records of account and was not part of the withdrawal value thereof. As words of art, "memoed" and "credited" have specific unalterable meanings, the former indicating a temporary bookeeping device by which the records of account reflect *anticipated* credits and the latter indicating that an addition has in fact been made.

Knight took custody pursuant to the ISLA for the purpose of conserving the assets of an institution whose capital was already impaired. His actions can be construed as nothing other than that he caused a rescission of the December dividend before it became due and payable and therefore prevented it from being credited to the accounts. Knight had warned the Directors that Marshall's capital was impaired. When he learned of their intention to proceed with the December dividend and when he received the final report of Marshall's condition he acted to prevent payment of the divi-

---

3. § 561.5 reads in relevant part as follows: "*Account of an insured member:* An 'account of an insured member' is the total amount credited (or, when dividends are not credited, apportionable after having been apportioned to a series) to any member in withdrawable or repurchasable accounts, whether or not such accounts are subject to any pledge, whether or not such accounts are insured in full, and whether or not dividends are subject to recapture * * *."

4. § 564.1 reads in relevant part as follows: "*Settlement of insurance upon default.* In the event of a default by an insured institution, the Corporation will promptly determine the insured members thereof and the amount of their insured accounts. The amount of each insur-

ed account will be determined from the security contract and from the books and records of the insured institution as of the last dividend or apportionment date, plus payments on, and less repurchases and withdrawals from, such insured account subsequent to such date without regard to (a) the actual value of the assets of the insured institution, (b) provisions of the security contract which authorize the insured institution in the event of voluntary withdrawal or repurchase, to retain or deduct any amount on account of premature withdrawal or repurchase, (c) whether or not dividends are subject to recapture, and (d) whether or not dividends are credited or apportioned to a series (being apportionable to each share account of the series) * * *."

dend. If such was not his intention, there was no need for his making the takeover effective one-half hour prior to the opening of business on the dividend day, December 31. Moreover, Knight and his agents did not permit the transfer of funds to Marshall's dividend account at the Chicago Bank to cover dividend checks for holders of Full-Paid accounts which were prepared and dated December 31. Nor did they permit the mailing of these checks or the checks which had been prepared for holders of Optional accounts who had requested that their dividends be mailed. The dividend was never posted, i. e., finally credited to the account ledger cards or control sheets. The two facts on which defendants rely, namely, that the December dividend was entered in fifty-eight passbooks which had been mailed to Marshall and that until 11:00 A.M. on the 31st, the tellers were entering the dividend on the passbooks of persons who appeared at the bank, must be read in light of the clear intention of the Director to stop all activity pertaining to the December dividend and prevent its payment and thus the further impairment of Marshall's capital.

With respect to the fifty-eight books, the entries were made on December 29 (although dated the 31st), which was prior to the takeover by Knight. On the 31st, these entries were lined out and marked void by the tellers. Under the circumstances, some confusion was bound to occur and the mixup over the proper course for the tellers to follow when persons presented their passbooks on the 31st is understandable. The initial decision to allow book posting was in error as was soon realized by Claessens when he observed the tellers making these notations. Miller also immediately recognized the mistake. Only 195 passbooks were presented for posting. The mistake was minor, and when viewed in light of all the acts taken that day which indicate the intent to prevent payment of the dividend, we think of little consequence.

Defendants also argue that in the normal course the posting of the dividend to the account ledger cards did not occur until some time after the dividend day and therefore, plaintiff can take no comfort from the fact that the dividend was not posted. Defendant, however, omits one crucial step. In the normal course, on dividend day, checks were mailed to holders of Full-Paid accounts and to some holders of Optional accounts. On or after the dividend day, persons would have the amount entered in their passbooks or could withdraw the amount before the posting occurred. In short, although not finally posted, the dividend, in the normal course, became *credited* to the accounts on the dividend day. That never took place with respect to the December dividend. Moreover, none of the dividends was actually received in currency by any member. The Director stepped in exactly for the purpose of preventing the payment of a dividend when Marshall was insolvent.

Marshall's Board possessed the power to rescind a dividend declared when it was insolvent. Its failure to do so after warnings from Knight prompted his interposition. The statutory grant confers upon him "all of the rights, powers, and privileges possessed by the officers and directors." 32 Ill.Rev.Stat. § 850.

Defendants rely on the language of the Regulations that insurance shall include dividends credited to the account "whether or not dividends are subject to recapture." At first blush this sounds persuasive, but read in light of the history of that language it is clear that those words are inapplicable here.

This language was added to the Regulations to correct an inequity in the insurance coverage. Some early building and loan associations did not distribute profits to shareholders by either direct periodic payments or direct credits to individual accounts. Instead they apportioned profits, by way of a suspense account, to a series of shares. A shareholder's account consisted of his subscription to shares of stock in a series of shares which had a definite maturity

date. He purchased these shares by making periodic payments on an installment plan. These associations were known as "serial associations." Early serial associations had no reserves for losses, but rather charged losses against current earnings. If the current earnings were insufficient to absorb the losses, profits previously apportioned to a series of shares might be "recaptured." Officials of the FSLIC had taken the position that earnings apportioned to a series were not insured since they might be recaptured before maturity or withdrawal.

In order to put serial and non-serial associations on the same footing with respect to insurance coverage, the above language was added to the Regulations. Thus, in serial and non-serial associations, all dividends credited to accounts or apportioned to a series are covered by insurance even though in serial associations the "dividends" are subject to recapture in the future.

We conclude that the December dividend was never credited to the accounts of Marshall's members and thus never became part of the withdrawal value. By taking control prior to the opening of business on the 31st and by halting all activity with respect to the December dividend, the Director of Financial Institutions effectively rescinded the dividend. It is clear that such was his purpose and that he accomplished it.

Plaintiffs contend that, even if the dividend had been credited to the accounts, the dividend would not have been part of the accounts' withdrawal value because it was an illegal dividend declared while Marshall was insolvent. In view of our conclusion that the dividend here was not credited to the accounts we need no reach a determination on this defense raised by the FSLIC. We note in passing, however, some difficulty with

such a position in view of the fact that, although it is agreed that the September dividend was also declared when Marshall was insolvent, the amount of that dividend was included in the insurance payout by the FSLIC. Also, the regulations state that insurance shall be paid "without regard to the actual value of the assets of the insured institution." That question, however, is not before us at this point.

The court is not unmindful of the chain of events that occurred at Marshall and the unfortunate effects on honest citizens who invested their money in that institution. We also recognize, however, that Members were paid, after some delay, the full balance of their accounts up to the $10,000 limitation minus the December dividend. The prudent action of the Illinois Director of Financial Institutions in stopping the dividend in all probability had important and beneficial effects for many persons who had financial relationships with Marshall. On balance then, we think the community was protected. Investors received their savings and all dividends save for one. In addition, the capital of the association was saved from further impairment.

We hold that the dividend declared on December 15, 1964 by the Directors of Marshall Savings and Loan Association to be credited and payable as of the opening of business on December 31, 1964 was never in fact credited and paid to Members of Marshall. Accordingly, it was not part of the withdrawal value of Members' accounts. An appropriate order will enter granting the FSLIC's motion for summary judgment, denying defendants' motion and granting a declaratory judgment that the FSLIC is not obligated to defendants and the class they represent for the amount of the December dividend.