477 F.2d 777
 BOARD OF DIRECTORS AND OFFICERS, FORBES FEDERAL CREDIT
UNION, Charter No. 11258, Forbes Air Force Base,
Topeka, Kansas, Petitioners,
v.
NATIONAL CREDIT UNION ADMINISTRATION, Respondent.
 No. 72-1351.
 United States Court of Appeals,
Tenth Circuit.
 April 26, 1973.
 
 Gerald W. Hyland (Dale W. Bruce and Robert L. Davis, Davis, Bruce, Davis & Cather, Wichita, Kan., on the brief), for petitioners.
 Edwin E. Huddleson, III, Atty., Dept. of Justice (Harlington Wood, Jr., Asst. Atty. Gen., and Robert E. Kopp, Atty., Dept. of Justice, on the brief), for respondent.
 Before HILL, McWILLIAMS, and BARRETT, Circuit Judges.
 McWILLIAMS, Circuit Judge.
 
 
 1
 This is a dispute between the officers and directors of the Forbes Federal Credit Union of Topeka, Kansas, and the National Credit Union Administration over the meaning of a 1967 amendment to the charter of the Forbes Federal Credit Union. The amendment in question relates to the eligibility requirements for membership in the Forbes credit union.
 
 
 2
 The matter was first heard by a Hearing Examiner designated by the Administrator of the National Credit Union Administration to conduct a hearing. After an extended evidentiary hearing, the examiner made elaborate findings and conclusions, and filed a "Recommended Decision," all of which was then adopted by the Administrator as his "Final Decision and Order." The officers and directors of the Forbes Federal Credit Union thereafter filed a petition in this court seeking direct judicial review by us of the Administrator's order, asking in connection therewith that we invalidate the order. 12 U.S.C. Sec. 1786(i). Background facts will have to be developed if the narrow issue is to be seen in context.
 
 
 3
 A federal credit union is defined by statute as a "cooperative association organized * * * for the purpose of promoting thrift among its members and creating a source of credit for provident or productive purposes." 12 U.S. C. Sec. 1752(1). The initial Act of Congress permitting the formation of such credit unions occurred in 1934.
 
 
 4
 In 1956, Forbes Federal Credit Union, hereinafter referred to simply as Forbes, was organized under the Federal Credit Union Act and was granted a charter by the Bureau of Federal Credit Unions, the predecessor agency to the National Credit Union Administration. 12 U.S.C. Secs. 1771-1790. By its terms this charter permitted Forbes to serve military personnel permanently assigned to the Forbes Air Force Base in Topeka, Kansas, and civilian personnel employed thereat.
 
 
 5
 In April 1967, Forbes was advised by the Bureau that it could apply for an amendment to section 5 of its charter which would permit it to extend its credit union services to a somewhat larger field of membership. Application for such charter amendment was made by Forbes, and the application therefor was approved by the Bureau on May 5, 1967. Section 5 of Forbes' charter, as thus amended by the so-called 1967 amendment, reads as follows:
 
 
 6
 "The field of membership shall be limited to those having the following common bond: Civilian employees and military personnel of the Department of the Air Force who work at and are permanently assigned to the Forbes Air Force Base in Topeka, Kansas; members of the U. S. Armed Forces, active or retired, or their dependents or dependent survivors who are eligible by law or regulation to receive benefits or services from the above military installation; members of this credit union who are stationed at military bases overseas and retain their membership in this credit union; employees of this credit union; members of their immediate families; and organizations of such persons." (Emphasis added.)
 
 
 7
 The emphasized portion in the foregoing constitutes the so-called 1967 charter amendment and the present controversy concerns the meaning of that particular language.
 
 
 8
 By way of additional background, this particular charter change came about as the result of a request from the Department of Defense to the Bureau that eligibility requirements be altered so as to permit membership in a local federal credit union by military personnel who were "geographically separated" from their parent organization and were receiving normal services such as, for example, commissary and exchange services, from the nearest military base providing such services. More particularly, in this regard the Department of Defense wrote as follows:
 
 
 9
 "* * * In order to correct this situation, [we] request your consideration of an amendment to BFCU regulations which would permit a member of the armed services, either active or retired or his legal survivors, to become a member of a credit union located on the military installation which provides other services to that member or survivor. * * *"
 
 
 10
 As a result of that request, the Bureau authorized amendments to the charters of several local federal credit unions of the same type granted Forbes. Inquiry was soon made to the Bureau as to whether such amendment permitted local credit unions to enroll as members any and all military personnel who were eligible to receive services at their particular military installation, regardless of whether they had actually received any benefits or services from the military base where the particular credit union was located. In this regard, apparently all military personnel, wherever located geographically, are "eligible" to receive benefits and services from any military base, even though they may never do so. In response to these inquiries, the Bureau issued a memorandum to all of its regional representatives and examiners in June 1967, interpreting the 1967 Amendment as follows:
 
 
 11
 "The Bureau interprets the [1967 Amendment] as applying only to those persons who are so situated that they can and in fact do utilize the benefits or services provided by the named installation. This is necessary to assure that the person is a part of the military community of the installation."
 
 
 12
 The foregoing "interpretation" of the so-called 1967 Amendment was generally announced to the federal credit union industry and in October 1967 the Bureau's bulletin specifically advised all Department of Defense affiliated credit unions, including Forbes, of its interpretation in the following language:
 
 
 13
 "To avoid any misunderstanding as to who would be eligible for membership by the adoption of the amendment, the following interpretation should be used as a guide:
 
 
 14
 'Those people who are so situated that they can and in fact do, make fairly regular use of the benefits and services provided by the named installation.'
 
 
 15
 "This is necessary to assure that the person is a part of the military community of the installation."
 
 
 16
 In 1968, the Bureau amended the 1967 Amendment to the end that charter amendments approved thereafter read as follows:
 
 
 17
 "[M]embers of the U. S. Armed Forces, active or retired, or their dependents or dependent survivors who are eligible by law or regulations to receive and are receiving benefits or services from the above military installation."
 
 
 18
 The italicized portion of the foregoing was added in 1968 to the wording of the 1967 Amendment, which addition was in line with the Bureau's prior "interpretation" of the 1967 Amendment. However, prior to the 1968 change, many local federal credit unions, including Forbes, had their charters amended in language of the 1967 Amendment, which did not include the words "and are receiving." And Forbes, at least, does not agree with the Bureau's interpretation of the 1967 Amendment.
 
 
 19
 Forbes' position, in a nutshell, is that the 1967 Amendment should be interpreted just as it reads, and that under the 1967 Amendment, Forbes is entitled to enroll as members any and all military personnel who are "eligible" to receive benefits and services from Forbes Air Force Base, regardless of whether the military personnel have ever in fact received any benefit or service at Forbes Air Force Base. Under such interpretation, as we understand it, Forbes could enroll as a member in its credit union military personnel located anywhere around the world, since all are "eligible" to receive benefits and services at Forbes Air Force Base, regardless of whether the individual sought to be enrolled has ever in fact received any benefit or service at Forbes Air Force Base. And, conversely, we assume that other credit unions with a similar charter amendment could invade Forbes Air Force Base and enroll military personnel attached to that installation.
 
 
 20
 These differing interpretations by Forbes and the Bureau of the former's 1967 charter amendment were known and recognized by each of the parties, but apparently did not come to a head till May 1969. In April 1969, the president of Forbes advised the Bureau that in his view the 1967 Amendment authorized Forbes to enroll as members any person in the military service, notwithstanding the Bureau's narrower interpretation. Despite a warning from the Bureau, Forbes, in May 1969, set up a so-called "branch office" at Sewart Air Force Base in Tennessee. More specifically, in May 1969 Forbes sent a representative to Sewart who conducted extensive business with military personnel on that base until March 1970, accepting, for example, some 1150 new members. There is some suggestion that Sewart Air Force Base was at the time in the process of being deactivated. In any event, some of the newly enrolled members were eventually transferred to Forbes Air Force Base in Topeka. However, other newly enrolled members were never transferred to Forbes Air Force Base and in fact were eventually transferred to other military installations.
 
 
 21
 In November 1970, the National Credit Union Administration, that agency having succeeded by Act of Congress to the powers and duties of the old Bureau, formally requested Forbes to abide by its interpretation of the 1967 Amendment. Forbes refused, and as a result of such refusal the Administrator on July 13, 1971, issued a Notice of Charges to Forbes and its Board of Directors, charging them with improperly expanding its membership. The matter was then referred to a Hearing Examiner to determine if a cease and desist order should issue to compel Forbes to follow the Administration's interpretation of the 1967 Amendment. As indicated, after hearing the Hearing Examiner made detailed findings and conclusions and recommended the issuance of such a cease and desist order. The ruling applied only prospectively, incidentally, and did not affect new members enrolled by Forbes up to that time. The recommended action of the Hearing Examiner was approved and adopted by the Administrator, whereupon Forbes initiated this action in this court, seeking a review of that order and asking that we invalidate it.
 
 
 22
 As indicated, it was Forbes' position before the Hearing Examiner, as it is here, that under a literal reading of the 1967 charter amendment it had the right to enroll as members in its credit union all military personnel "eligibile by law or regulations to receive benefits or services" from Forbes Air Force Base, whether they did so in fact or not. In line with this interpretation, Forbes denies that it was in anywise violating its charter in going to Sewart Air Base in Tennessee and enrolling military personnel at that installation, even though many such enrollees were not transferred to Forbes Air Force Base and never received any services or benefits from that base. In thus contending, Forbes argues that the words used in the 1967 charter amendment are clear, plain and unambiguous and should be given their normal, natural meaning. Forbes places considerable emphasis on the reasoning contained in landmark case of Dartmouth College v. Woodward, 17 U.S. 518, 4 L. Ed. 629 (1819), concerning the sanctity of a charter, and the fact that a charter, once granted, cannot thereafter be unilaterally changed.
 
 
 23
 It was the position of the Administration before the Hearing Examiner, as it is here, that the interpretation sought by Forbes of the 1967 charter amendment is at odds with the Federal Credit Union Act, the rules and regulations of the Administrator of the National Credit Union Administration, and the contemporaneous interpretation given both the statute and the charter amendment by the administrative agency charged with administering and enforcing the Act. As indicated, the Hearing Examiner agreed with the position of the National Credit Union Administration, as did the Administrator. We do too. Let us first examine further the Federal Credit Union Act itself.
 
 
 24
 Section 1753, 12 U.S.C., provides, in part, as follows:
 
 
 25
 "Federal Credit Union Organization-
 
 
 26
 "Any seven or more natural persons who desire to form a Federal credit union shall subscribe before some officer competent to administer oaths an organization certificate in duplicate which shall specifically state-
 
 
 27
 ******
 
 
 28
 * * *
 
 
 29
 "(2) the location of the proposed Federal credit union and the territory in which it will operate;
 
 
 30
 ******
 
 
 31
 * * *
 
 
 32
 "(5) the proposed field of membership, specified in detail."
 
 
 33
 The requirement of subsection 2 that the organization certificate shall "specifically state * * * the territory in which it [the federal credit union] will operate" is deemed to be of some significance. It indicates to us that Congress intended that a federal credit unit would operate within a described geographical territory and not round-the-world.
 
 
 34
 Concerning membership in a federal credit union, 12 U.S.C. Sec. 1759 provides as follows:
 
 
 35
 "Federal credit union membership shall consist of the incorporators and such other persons and incorporated and unincorporated organizations, to the extent permitted by rules and regulations prescribed by the Administrator, as may be elected to membership and as such shall each, subscribe to at least one share of its stock and pay the initial installment thereon and the entrance fee; except that Federal credit union membership shall be limited to groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district. * * *"
 
 
 36
 From the foregoing statutory provision we learn that it was the intent of Congress that members in a particular federal credit union should have a "common bond" with each other. More about this "common bond" requirement later, but we do note here that the "common bond" requirement has been deemed something more than simply the bond of mutually serving in the military. Also, it is apparent that Congress empowered the Administrator of the National Credit Union Administration to promulgate rules and regulations regarding those eligible to become members of a local federal credit union.
 
 
 37
 Concerning the powers of the Administrator, 12 U.S.C. Sec. 1766 provides, in part, as follows:
 
 
 38
 "(a) The Administrator may prescribe rules and regulations for the administration of this chapter (including, but not by way of limitation, the merger, consolidation, and dissolution of corporations organized under this chapter).
 
 
 39
 "(b) (1) The Administrator may suspend or revoke the charter of any Federal credit union, or place the same in involuntary liquidation and appoint a liquidating agent therefor, upon his finding that the organization is bankrupt or insolvent, or has violated any of the provisions of its charter, its bylaws, this chapter, or any regulations issued thereunder."
 
 
 40
 Subsection (a) thus grants the Director, now the Administrator, the broad power to prescribe rules and regulations for the administration of the entire chapter and subsection (b) specifically grants him the power to suspend or revoke the charter of any federal credit union upon a finding that the local credit union has violated either the provisions of its own charter or bylaws, or has violated any provision of the chapter or any administrative regulation issued pursuant thereto.
 
 
 41
 Concerning the statutory requirement of a "common bond" referred to above, the Administrator under his statutory rule-making authority has long construed the "common bond" concept to restrict membership of credit unions located at military installations to persons who in fact receive at least some benefits and services from the installation where the credit union is itself located. As evidence of this, the following excerpt from an official publication of the Administration is pertinent:
 
 
 42
 "COMMON BOND
 
 
 43
 "The Bureau of Federal Credit Unions defines and explains common bond, as applied to Federal credit union chartering, as follows:
 
 
 44
 'Common bond is that pre-existing condition which causes the members of a group to associate together, to know each other, to have common interests and purposes, and to be able and willing to work together to accomplish group objectives. A group has a common bond when it is composed of people who have the same employer, or are otherwise associated through some common interest or enterprise, and are so situated in relation to each other as a consequence of that community of employment or association that they could be expected to operate effectively as a cooperative organization for credit union purposes.
 
 
 45
 'A group, to qualify for a Federal credit union charter, should provide opportunities for the members to associate together, and, as a result of such association, to develop common loyalties and mutual interests. Furthermore, in an associational group, the members must receive substantial benefit from membership in the association. * * *' "
 
 
 46
 The Hearing Examiner advanced two alternative bases upon which he determined that the interpretation given the 1967 charter amendment by the Administration was the proper one, and that the interpretation argued for by Forbes was improper. One such ground was that the interpretation contended for by Forbes was at variance with Congressional intent as expressed in the Act itself, as well as being at odds with the various rules and regulations of the Administration. He reasoned, in effect, then that the charter amendment should be interpreted in a manner that would square with the applicable statutes and rules and regulations. We agree with this conclusion.
 
 
 47
 As indicated earlier, 12 U.S.C. Sec. 1786(i) provides for judicial review of an order of the Administrator of the Federal Credit Union Administration. And that statute states that our review shall be as provided in the Administrative Procedure Act. Section 706, 5 U.S. C., spells out the scope of our review of the order of the Administrator. Illustrative of the fact that in the instant case our review of the decision of the Administrator is not wide-ranging in scope, we note, for example, that administrative action has been held to be conclusive on review unless such action is not in accordance with law or is unsupported by competent, material and substantial evidence, or is arbitrary or capricious. Reconstruction Finance Corp. v. Lightsey, 185 F.2d 167 (4th Cir. 1950). With this in mind, then, let us examine the principles which in our view govern this controversy.
 
 
 48
 In the first place, no administrative body may contract with a corporate body which it regulates in a manner contrary to the statute which it is charged with administering, nor in a manner which would not give full effect to the intent of Congress. Peoples Bank v. Eccles, 82 U.S.App.D.C. 126, 161 F.2d 636 (1947), rev'd on other grounds, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784 (1947). In determining the intent of Congress, administrative interpretation, practice and usage are accorded great weight by a reviewing court where a particular statute is susceptible of different reading. Lindberg v. Brenner, 130 U.S.App.D.C. 257, 399 F.2d 990 (1968); Garvey v. Freeman, 397 F.2d 600 (10th Cir. 1968); and H. B. Zachry Co. v. United States, 344 F.2d 352, 170 Ct.Cl. 115 (1965). So, it has been held that a court should not overturn an administrative interpretation of a statute which it is charged with administering unless it can be said that the interpretation is plainly erroneous. Jno. McCall Coal Co. v. United States, 374 F.2d 689 (4th Cir. 1967). Similarly, it has been stated that an administrative agency's interpretation of its own regulations is to be accorded great deference and is controlling as long as it is one of several reasonable interpretations, and even though it may not appear quite as reasonable as some other. Roy Bryant Cattle Co. v. United States, 463 F.2d 418 (5th Cir. 1972). Finally, it is a well settled principle that where a contract is susceptible of two interpretations, preference will be given to the interpretation which does not violate the law. Great Northern Railway Co. v. Delmar Co., 283 U.S. 686, 51 S.Ct. 579, 75 L.Ed. 1349 (1931).
 
 
 49
 Application of the foregoing principles to the instant controversy leads us to conclude that the order of the Administrator approving and adopting the findings, conclusions and recommendation of the Hearing Examiner is proper and correct. To approve, in effect, the earlier action of Forbes in going from Kansas to Tennessee to enroll new members simply because they were technically eligible to receive benefits and services at Forbes Air Force Base, though in fact they did not, would mean that in the future Forbes in its efforts to increase its membership could create a branch office at virtually any military installation, wherever located. In our view, such would violate the statutory provision that a federal credit union shall serve a described territory and that its members shall have a "common bond," one with the other, as that phrase has been consistently interpreted by the Administrator.
 
 
 50
 In sum, then, the order complained of is not plainly erroneous; and, on the contrary, in our view the Administrator has given the 1967 charter amendment a reasonable interpretation consonant with the Congressional mandate and the regulations promulgated pursuant thereto.
 
 
 51
 Order affirmed.