**In re OLIVER M. ELAM, JR., CO., INC., Plaintiff.**

**COALPORT, INC., Plaintiff-Appellant,**

v.

**Malcolm BALDRIDGE, Secretary of Commerce; Carlos Campbell, Assistant Secretary of Commerce, Economic Development Administration; and Eastern Kentucky Port Authority, Defendants-Appellees.**

**No. 84–5452.**

United States Court of Appeals, Sixth Circuit.

Argued March 28, 1985.
Decided Aug. 30, 1985.

James Park, Jr., argued, Katherine K. Yunker, Brown, Todd & Heyburn, Lexington, Ky., Richard E. Wentz, Robinson, Arnzen, Parry & Wentz, Covington, Ky., Roger R. Cantrell, Cantrell & Nichols, Greenup, Ky., for plaintiff-appellant.

Louis DeFalaise, U.S. Atty., Lexington, Ky., Ms. Leslie Dellon, argued, Dept. of Justice, Civil Div., Washington, D.C., Roger W. Hall, Adkins, Hall, Howell & Duggan, Ashland, Ky., for defendants-appellees.

Before ENGEL and KRUPANSKY, Circuit Judges, and HULL *, District Judge.

ENGEL, Circuit Judge.

This litigation challenges the adequacy of findings made by the Economic Development Administration of the Department of Commerce (EDA) in connection with its approval of federal government funding for a riverport facility to be located on the Ohio River in Ashland, Kentucky. The riverport was designed to provide complete cargo services with covered storage for general cargo and facilities to handle general cargo loading and coal loading between rail, river and truck. While the estimated cost of the project was $4 million, the amount of the direct grant requested from the EDA was $1.5 million. Because we find that the EDA failed to recognize the requirement of the enabling statute that the project "fulfill a pressing need of the area," 42 U.S.C. § 3131(a)(1)(B), and because the agency's findings fail to demonstrate any good faith recognition of the limitations Congress placed upon such funding in 42 U.S.C. § 3212, we vacate the judgment of the district court upholding the grant and direct a remand to the EDA for further proceedings consistent with our opinion.

Congress enacted the Public Works and Economic Development Act of 1965 (PWEDA) to "help areas and regions of substantial and persistent unemployment and underemployment to take effective steps in planning and financing their public works and economic development." 42 U.S.C. § 3121. The Act empowers the Secretary of Commerce, and through him the Assistant Secretary for Economic Development, *id.* § 3201, to provide federal financial assistance "to communities, industries, enterprises, and individuals in areas needing development" so that those areas can "help themselves achieve lasting improvement and enhance the domestic prosperity by the establishment of stable and diversified local economies and improved local conditions." *Id.* § 3121.

While Congress makes general appropriations for various programs created by the

---

* Honorable Thomas G. Hull, Chief Judge of the United States District Court for the Eastern District of Tennessee, sitting by designation.

Act, the EDA determines which specific projects will receive financial aid. Several types of financial assistance are available. Organizations seeking public works grants must file an application with the EDA. *Id.* § 3131. The EDA may make a direct grant of not more than 50 percent of the cost of a project if it finds that

(A) the project for which financial assistance is sought will directly or indirectly (i) tend to improve the opportunities, in the area where such project is or will be located, for the successful establishment or expansion of industrial or commercial plants or facilities, (ii) otherwise assist in the creation of additional long-term employment opportunities for such area, or (iii) primarily benefit the long-term unemployed and members of low-income families or otherwise substantially further the objectives of the Economic Opportunity Act of 1964;

(B) the project for which a grant is requested will fulfill a pressing need of the area, or part thereof, in which it is, or will be, located;

(C) the area for which a project is to be undertaken has an approved overall economic development program as provided in section 3142(b)(10) of this title and such project is consistent with such program; and

(D) in the case of a redeveloped area so designated under section 3161(a)(6) of this title, the project to be undertaken will provide immediate useful work to unemployed and underemployed persons in that area.

*Id.*

However, section 702 of the Act, 42 U.S.C. § 3212, places an express restriction on the extension of financial aid:

No financial assistance under this chapter shall be extended to any project when the result would be to increase the production of goods, materials, or commodities, or the availability of services or facilities, when there is not sufficient demand for such goods, material, commodities, services, or facilities, to employ the efficient capacity of existing competitive commercial or industrial enterprises.

In May, 1982, the Eastern Kentucky Port Authority (EKPA) applied to the EDA for a development grant to be used as partial funding for a general cargo riverport to be constructed in Ashland, Kentucky. During the public comment period, considerable support for the riverport was expressed by the City of Ashland, various county officials and certain local industries and small businesses, including electric power co-operatives and independent coal producers and brokers. There was also strenuous opposition from the operators of existing local riverports, who argued that the area was already over-saturated with coal-loading facilities.

The Office of Compliance Review of the EDA conducted a "702 study" to determine whether the proposed grant would comply with section 702 of the PWEDA, 42 U.S.C. § 3212. Although the study contained no specific finding on the under-utilization of existing facilities, production figures from five area coal-loading ports indicated that they were operating far below their permit capacities. The study also projected increases in waterborne coal shipments from eastern Kentucky of at least 1,000,000 tons per year through 1990. The EDA compared this projected increase in demand with the capacity of the proposed riverport and determined that no analysis of the utilization of existing facilities was necessary because the projected increase in demand was greater than the projected capacity of the new facility. Accordingly, the EDA approved the grant despite the objections of the existing riverport operators.

Pursuant to 42 U.S.C. § 3211, which authorizes suit against the Secretary of Commerce in federal district court, Coalport, Inc. and Oliver Elam, Jr., Inc., operators of local coal-handling docks, brought an action in the Eastern District of Kentucky, seeking judicial review of the grant. They claimed that existing coal-handling ports within the market area were not being used to their efficient capacity and that EDA funding of the EKPA's proposed project

was therefore proscribed by section 702. Upon cross-motions for summary judgment, the matter was referred to a magistrate. In a seemingly inconsistent report, the magistrate found that the EDA had not applied section 702 in an unlawful manner, but suggested that the portion of the grant to be used for construction of the coal-handling facility be withheld because "EDA acted arbitrarily and capriciously in making the grant for the coal facility without properly addressing plaintiffs' underutilization of existing capacity argument."

The district judge accepted the magistrate's conclusion that the "702 study" was properly conducted by the EDA. However, he held that the court had no authority to divide the grant. Finding that the EDA did not exceed its statutory authority or act arbitrarily and capriciously, the district judge granted the defendants' motion for summary judgment. Coalport alone appealed.

The parties do not challenge the jurisdiction of the district court or the standing of plaintiffs to bring this suit. They agree that this matter concerns informal agency action and that, therefore, the scope of review is governed by the Administrative Procedure Act, 5 U.S.C. § 706(2). Under subsections (A) and (C) of section 706(2), the court must set aside agency action, findings or conclusions that it finds "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

Coalport's primary argument is that approval of the federal grant to the EKPA violates section 702, and therefore exceeds the EDA's statutory authority, because the proposed riverport will increase the availability of coal-loading facilities when there is not sufficient demand to employ the efficient capacity of existing competitive coal-loading ports. Coalport also argues that the findings of the 702 study are arbitrary and capricious because the study did not restrict its projections of increased demand to the market in which Coalport claims the new riverport would compete. In contrast, the EDA claims that its action did not exceed statutory authority because its interpretation of what section 702 requires is reasonable. It also claims that its findings were not arbitrary and capricious because the market in which the riverport will compete is not limited to ports used by small independent coal producers.

Only two federal court decisions have dealt directly with the EDA's interpretation of section 702. *Afton Alps, Inc. v. United States*, 392 F.Supp. 543 (D.Minn.1974); *Van Hoven Co. v. Stans*, 326 F.Supp. 827 (D.Minn.1971). Both of these cases originated in the District of Minnesota although they were decided by different judges. In each case the court accepted the government's argument that the EDA had satisfied section 702, merely by determining that projected increased demand would be sufficient to absorb the output of the proposed project.

The opinion in *Afton Alps* contains the more detailed explanation of the rationale for the government's position. That case involved a grant to aid the construction of a proposed winter and summer recreation facility near Duluth, Minnesota. Several ski resorts challenged the grant, arguing that there was insufficient demand to utilize existing facilities. The EDA had conducted a study showing that the projected growth in demand would exceed the capacity of the proposed resort. Circuit Judge Heaney, sitting by designation, found this determination sufficient to satisfy section 702 and gave the following reasons:

> When the projected market growth (new demand) is sufficient to absorb the output of the proposed facility (production of the applicant), Section 702 will not be violated since none of the existing market demand will be taken from competitive facilities within the market area. In this case, the EDA determined that the projected market growth within the next three years would consist of 133,000 new "skier days." It also determined that Spirit Mountain would draw 122,000 skier days within the three years following

the opening of the facility. It concluded that since Spirit Mountain would not fully serve the projected new demand, Section 702 would not be violated. This method is based on the assumption that existing ski facilities have no special claim to the new business.

While there are a number of methods that could be used in making the Section 702 determination, and while some might be preferable to the one chosen by the EDA, the Court cannot say that the method is not a permissible one under [the] statute. Ms. D. Patricia Keeler, Chief of the Industries Studies Division of the EDA since 1967, testified that she has applied this method to hundreds of projects. Moreover, the EDA has formally adopted the method in a directive. The practice is of long standing and has been consistently applied over the years. Hence, as an interpretation of the statute, the method is entitled to deference by the courts. *See National Labor Relations Board v. Boeing Co.,* 412 U.S. 67, 74–75, 93 S.Ct. 1952, 1956–57, 36 L.Ed.2d 752 (1973); *Leary v. United States,* 395 U.S. 6, 25, 89 S.Ct. 1532, 1542, 23 L.Ed.2d 57 (1969) (dictum); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Doe v. Department of Transportation,* 412 F.2d 674, 678 (8th Cir.1969). The method had been employed in the agency action challenged in *Van Hoven Co. v. Stans,* 326 F.Supp. 827 (D.Minn.1971), and upheld by Chief Judge Devitt.

The statute is silent on the question of whether or not existing competitors should be entitled to absorb the new growth in the market. The expertise of the agency is to be respected in resolving the ambiguity created by that silence. *See, Board of Directors of Officers, Forbes Federal Credit Union v. National Credit Union Administration,* 477 F.2d 777, 784 (10th Cir.1973), *cert. denied,* 414 U.S. 924, 94 S.Ct. 233, 38 L.Ed.2d 158 (1973); *Gulf Oil Corp. v. Hickel,* 140 U.S.App.D.C. 368, 435 F.2d 440 (1970); *Jno. McCall Coal Co. v. United States,* 374 F.2d 689, 691–692

(4th Cir.1967). Certainly, it is reasonable to conclude that Section 702 cannot be meant to proscribe all competition. There will inevitably be a tension between that section's command and the aim of the Act to promote development in economically depressed areas. In light of that tension, this Court cannot say that the EDA's interpretation permitting new applicants to serve the new growth is plainly erroneous or inconsistent with the law. This is not to say that there may never be cases in which the method adopted by the EDA is inappropriate. It is only to say that the inappropriateness has not been demonstrated here.

392 F.Supp. at 548–49.

Judge Heaney's interpretation of section 702 presents several problems. First, it appears to overlook the plain language of the statute. On its face, the statute prohibits assistance when excess capacity already exists within the industry rather than when proposed output of the financed project exceeds projected growth in the market. Second, Judge Heaney's analysis assumes that the only purpose of section 702 is to ensure that existing market demand will not be taken from competitive facilities within the market area. However, contrary to Judge Heaney's assumption that existing facilities have no special claim to the new business generated by increased demand in the market, section 702 seems to suggest a congressional desire to let increased demand alleviate overcapacity among existing enterprises before public funds are used to finance the construction of new facilities.

Two other cases cited by the parties deal with challenges to EDA action under section 702. In *CF & I Steel Corp. v. Economic Development Administration,* 624 F.2d 136 (10th Cir.1980), the operator of an existing steel mill challenged an EDA loan guarantee to aid the construction of a new steel mill. The 702 study conducted by the EDA in that case had indicated that demand would exceed the efficient capacity of existing competitive enterprises. The plaintiff challenged only the reliability of

the data upon which the EDA had relied. Because the EDA already had examined the efficient capacity of existing competitive enterprises, no question was raised whether it could have satisfied section 702 without doing so.

Similarly, in *Lukens Steel Co. v. Klutznick*, 629 F.2d 881 (3d Cir.1980), the question whether the EDA could satisfy section 702 without examining the utilization of existing industry capacity was not raised because the EDA already had made a preliminary finding that demand *was insufficient* to utilize the efficient capacity of existing enterprises. The grant of financial assistance was based on the EDA's determination that the assistance would not significantly increase production. The court of appeals found that determination arbitrary and inconsistent with the purposes of the statute and, therefore, remanded the case for further consideration. The Third Circuit observed:

> Section 702 of PWEDA prohibits assistance to a company when the result would be "to increase the production of goods ... or the availability of services or facilities" when "demand" is insufficient to employ the existing "efficient capacity" of competitive commercial or industrial enterprises. *See* 42 U.S.C. § 3212; 13 C.F.R. § 309.2 (1980). Simply put, EDA assistance is not to be used to expand the production of steel products if there already is excess capacity in the domestic steel industry.

629 F.2d at 884.

In summary, two cases from the District of Minnesota accepted the government's interpretation of section 702. There are no other cases directly considering the issue; however, the Third Circuit in *Lukens* has hinted in dicta that it might favor the interpretation of 702 espoused by Coalport in this case.

The legislative history indicates that the general purpose of the PWEDA was "to provide a comprehensive program of Federal assistance to help provide more jobs and higher incomes for people who live in areas where jobs are scarce or incomes are low."

H.R.Rep. No. 539, 89th Cong., 1st Sess. 2, *reprinted in* 1965 U.S.Code Cong. & Ad. News 2788, 2789 [hereinafter cited at H.R. Rep.]. *See also* quotation from 42 U.S.C. § 3121, p. 2, *ante*. Representative James C. Cleveland introduced section 702 as an amendment to the PWEDA in an effort to prevent problems that had arisen under similar preceding legislation. He explained the purpose of the amendment in his supplemental views to the House Report:

> The ARA [EDA's predecessor] has been rightfully criticized for building factories which contribute to oversupply and overcapacity. For example, they built a shoe factory in Indiana at a time when shoe factories in New Hampshire were closing because of oversupply. They have constructed pulp and tissue mills at a time when problems of oversupply were seriously affecting these industries in my State, and the same can be said for plywood and other industries. The purpose of my amendment would be to prevent this type of shocking and prodigal waste of Government money and this gross unfairness to American taxpayers.

H.R.Rep., *supra*, at 59, *reprinted in* 1965 U.S.Code Cong. & Ad.News at 2836. Representative Cleveland's statements on the House floor, made when the amendment was adopted, reflect this same intent:

> This is an amendment which I particularly hope will be adopted, because certainly it will go far to remove many of the criticisms of this program. My amendment in effect would provide that one cannot construct new factories and new facilities with taxpayers' money, with government money, if this is going to result in oversupply or unfair competition for existing facilities.
>
> How ridiculous can the U.S. Government get, when it spends almost $2 million to build a new motel outside of Detroit at the time that the motel and hotel industry in Detroit had a 54-percent occupancy rating?
>
> This is *not doing anything for* unemployment. This is simply making a tough situation worse. There is abso-

lutely no justification for the U.S. Congress enacting legislation like this unless it is at least willing to go a sled length with existing industry, by saying that we will not build competition for you right across the street from you.

\* \* \* \* \* \*

This is probably one of the most constructive amendments offered here today. Generally speaking, this amendment would prevent the incredible situation which arises when the ARA lends money to establish a business which is going to create goods and services that are already in oversupply.

This amendment comes from hard experience in my own district.

This comes directly from the experience I have had in New Hampshire. When shoeshops in New England and New Hampshire were closing, we read that ARA funds were building shoeshops in rural Indiana. Not only were they creating more shoes at a time of bad oversupply, but they were creating jobs in an unorganized labor market and in a low wage labor market in direct competition with New England labor. This is but one of many examples. Hardwood plywood plants were being built with ARA money at a time when we had an oversupply of it. The same is true in the pulp and paper industry.

This amendment is simple. It will prevent this type of shocking misuse of the taxpayers' funds.

111 Cong.Rec. 19,951, 20,277 (1965) (statements of Rep. Cleveland). Similarly, Representative Richard D. McCarthy stated:

What it would do in effect is prohibit the ARA from coming in and loaning money to set up a new company to compete directly in the same market area with an established company in the same line of business. This is against their policy, they tell me. I said, "Why do you not accept my amendment, then?" They said it would tie their hands. But they come in in the shoe industry, in the paper industry, and in the particle board industry and the gypsum industry where I had firsthand knowledge of it and do this. There were six gypsum plants out in the southwestern part of the United States. They were not getting enough business and they needed a new gypsum plant out there like they needed a hole in the head. Well, what did the ARA come in and do? They did not put one new gypsum plant there but they put two new gypsum plants there. Now they are working 3 days a week and most of them are in the red. I suggest this is not a liberal or a conservative matter but is a matter of woolyheadedness, of people taking tax dollars from one company which does not have enough business and turning around and giving it to another company to get them up in direct competition with the other company.

*Id.* at 20,277 (statement of Rep. McCarthy).

The EDA argues that Congress has tacitly approved its construction of section 702 because Congress has not amended the section or otherwise sought to change the EDA's interpretation. The agency cites testimony from a congressional oversight hearing at which EDA officials testified concerning the agency's construction of section 702. At that time, Dorothy Patricia Keeler, then Chief of the Industrial Studies Division of the EDA, stated: "The probable effect of any project upon an industry can be determined by computing the impact of the applicant's projected production on current and anticipated output." *Administration of Section 702 Under The Public Works and Economic Development Act of 1965: Hearings Before The Special Subcommittee On Economic Development Programs of The House Committee On Public Works*, 90th Cong., 2d Sess. 150 (July 25, 1968). [Hereinafter cited as *Hearings* ]. The EDA contends that because Congress did not amend section 702 following the oversight hearings in 1968 it has tacitly approved the agency's statutory construction.

Ms. Keeler gave her testimony at the oversight hearings in connection with an EDA directive outlining the agency's procedures for implementing section 702. At-

tached to the directive was a checklist of "procedures for making a section 702 study," which the EDA had recently adopted for internal use in making section 702 determinations. Section 2 of that checklist called for an analysis of existing firms and new construction expected to compete with projects proposed for EDA assistance. *Hearings, supra,* at 152. Although Ms. Keeler admitted that the EDA had failed to obtain information concerning existing competitors in at least one case before the checklist was developed, *id.* at 178, she indicated that under the new procedures set forth in the directive, someone would have definite responsibility for gathering that information, *id.* at 175. Representative Cleveland characterized section 2 of the checklist as the "most significant" addition to EDA procedures for conducting 702 studies. *Id.* at 181.

In this light, Coalport contends that the construction of section 702 now advanced by the EDA is different from the construction outlined in the oversight hearings. Moreover, Coalport points out that Congress has never been informed that the EDA is universally applying the construction of section 702 it now advances. Finally, Coalport argues that even if the EDA had consistently applied its current interpretation of section 702, that interpretation could not stand because it is unreasonable.

 Although the interpretation put on a statute by the agency charged with administering it is entitled to some deference, the courts remain the final authorities on issues of statutory construction. *FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981); *Ramey v. Block,* 738 F.2d 756, 761 (6th Cir.1984). When interpretation of the statute does not require special knowledge within the agency's field of technical expertise, reviewing courts sometimes accord little deference to the agency's construction. *Petrou Fisheries, Inc. v. ICC,* 727 F.2d 542, 545 (5th Cir.1984). This may be because courts of-

ten have greater expertise than the agency in matters of pure statutory interpretation. *See generally* 5 Davis, Administrative Law Treatise § 29:14 (2d ed. 1984). In any event, the courts must reject administrative constructions of a statute "that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. at 32, 102 S.Ct. at 42.

The EDA's position, that it has fully satisfied section 702 when it finds that future growth in demand will exceed the capacity of the proposed project, finds no support in the plain language of section 702. Whenever a proposed project will increase the availability of services or facilities, section 702 requires a finding that demand is, or at least will be, sufficient to employ the efficient capacity of existing competitive enterprises before financial assistance may be granted.

Furthermore, the EDA's interpretation would frustrate the congressional policy behind section 702. A simple example will illustrate. Suppose a manufacturing plant in a particular industry were operating under depressed conditions at only 20 percent of capacity. The EDA's interpretation of section 702 would permit it to grant federal funds for construction of a competing plant as long as projected increases in demand would at least equal the capacity of the new plant. This would be so even if the existing plants would be operating at only slightly more than 20 percent capacity after the increase in demand. Such a result, in our view, plainly conflicts with the policy Representative Cleveland sought to implement when he introduced section 702.

We conclude that the procedures followed by the EDA in approving the grant to the EKPA were deficient in at least two respects. First, assuming the reliability of the EDA's projection of tremendous growth in the loading of coal from eastern Kentucky onto barges,[1] the agency's sec-

---

1. It is difficult to tell what information the EDA relied on in making its section 702 determina-

tion. The United States Magistrate's report suggests that the agency may have relied upon a

tion 702 study is incomplete and basically incomprehensible insofar as it purports to define the market in which the proposed riverport would compete. In describing coal-handling facilities, the study states:

> Data pertaining to the number of coal-handling facilities indicates that there are 18 such facilities on the Ohio River and 6 on the Big Sandy River. The monthly capacities of these facilities range from about 50,000 tons to 600,000 tons. While these coal docks do exist, there is considerable evidence which indicates many are captive or not available to any user on a regular basis. Others will not allow use of the coal dock unless the coal is sold to them, usually at a price below the current market price.

The study goes on to list capacity and use figures for only the five docks available for use by small independent coal operators. However, in projecting increases in demand, the study does not differentiate between increases attributable to small independent operators and those attributable to other producers. The study does not indicate which coal producers logically would be expected to use the proposed port nor does it explain how increases in waterborne coal shipments from the entire eastern Kentucky area will relate to the need for the proposed facility in Ashland. Likewise, the EDA has made little effort to determine the extent to which existing facilities might be available to the coal producers who could be expected to use the proposed

facility. In short, the data seems to be little more than a disorganized recitation of facts that bear little internal relationship to each other and that could not form a sufficient factual basis for the EDA's conclusion. No prudent business person could be expected to make business decisions concerning the development of this type of facility based upon this information.

We do not suggest that the EDA must accept Coalport's contention that the proposed riverport will serve only small independent coal producers; however, given the EDA's finding that many coal docks are captive to large producers, it would seem unreasonable simply to assume that the competitive market will include the *entire* projected increase in waterborne coal traffic absent a showing that the captive docks are already operating at capacity. Without a specific determination of the market in which the proposed riverport will compete, it is difficult to see how the EDA can assess the adequacy of existing facilities to meet both current and future needs, or how it can determine that the proposed project "will fulfill a pressing need of the area," as required by 42 U.S.C. § 3131(a)(1)(B).

Second, the EDA has ignored all indications that there may be excess capacity among existing coal docks. To the extent that the figures from the 702 study are specific and are corrected for mathematical accuracy,[2] they show an astonishing unde-

study conducted by the Battelle Institute projecting a 143 percent increase in waterborne coal traffic in the Huntington, West Virginia area between 1976 and 1990, or upon figures from the Kentucky Department of Energy estimating that eastern Kentucky coal loaded on barges would increase at an average annual rate of 1,400,000 tons between 1981 and 1990. The 702 study itself concluded that waterborne coal shipments "in the applicant's market area" would increase by at least 1,000,000 tons annually through 1990.

We agree that an agency generally ought to be free to consult with the sources it feels most appropriate to reach an informed judgment; the parties do not challenge the fact-finding role of the EDA here. However, on the basis of the record before us, it is difficult to determine which facts were available to the EDA when it

made the section 702 determination and which were inserted into the record later in the proceedings. The EDA itself concedes that it offered the grant to EKPA two days before the 702 study was issued, although it claims to have relied upon a memorandum from the Director of its Office of Compliance Review indicating that the project would not violate section 702 and that the study was forthcoming.

We cannot tell with reliability what information was available to the EDA officials when they decided to offer the grant. We assume that they did indeed know of reliable predictions of growth in the coal-loading industry.

**2.** In the column from Table 1 labeled "Present Avg. Monthly Use (Tons)," the total given is 129,000. The correct sum of the numbers in the column is 99,000.

rutilization of existing facilities. For the five coal docks listed on Table 1 of the study, the total annual stated capacity is 14,400,000 tons. Of that amount, state authorities have issued permits allowing the docks to load 5,208,000 tons of coal annually. The total average annual use of these docks at the time this information was collected was 1,188,000 tons. Assuming that the permit capacity represents the actual limit on how much coal the docks can load, demand would have to quadruple even to begin to approach the capacities of these five docks alone. Although the EDA argues that the use and capacity figures in its study are of questionable reliability because they were supplied by the coal docks themselves, the agency has made no effort independently to determine the extent to which the figures may be an inaccurate or unfair gauge of actual capacity. Given this evidence of excess capacity, the EDA should have engaged in more careful fact-finding before deciding to offer the grant to the EKPA.

■ In summary, the EDA's failure to address the question of excess capacity is contrary to the express command of section 702 and is, therefore, "not in accordance with law." Furthermore, because the EDA did not define the market in which the proposed riverport would operate and because it did not relate its findings of future growth in demand to the capacity of existing coal docks, its determination that the grant would not violate section 702 is arbitrary and capricious.

Given this state of affairs, our role is not to substitute our personal judgment concerning whether to make this grant to the EKPA. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Instead, we vacate the judgment of the district court with instructions to remand the case to the Secretary of Commerce for further proceedings consistent with this opinion. At a minimum, the agency must develop a factual basis for determining whether a "press-ing need" has been established and must specifically address the issue of "underutilization of existing facilities" as Congress contemplated in enacting section 702 of the PWEDA.

So Ordered.