663 F.Supp. 833 (1987)
Jeffery HERBERT, as Trustee for Savannah Securities, Inc., d/b/a Hillcrest Abbey and Mausoleum, a corporation, Plaintiff,
v.
NATIONAL CREDIT UNION ADMINISTRATION BOARD, managing body for the National Credit Union Administration, an agency of the United States, Defendant.
Jeffery HERBERT, as Trustee for Magnolia Memorial Gardens, Inc., Plaintiff,
v.
NATIONAL CREDIT UNION ADMINISTRATION BOARD, managing body for the National Credit Union Administration, an agency of the United States, Defendant.
Jeffery HERBERT, as Trustee for Hillcrest Abbey West, Inc., a corporation, Plaintiff,
v.
NATIONAL CREDIT UNION ADMINISTRATION BOARD, managing body for the National Credit Union Administration, an agency of the United States, Defendant.
Nos. 86-689C(1), 86-691C(1), and 86-692C(1).
United States District Court, E.D. Missouri.
June 29, 1987.
*834 Joseph G. Wright III, Anderson, S.C., Mark T. Keaney, St. Louis, Mo., for plaintiff.
James D. McCoy, Asst. U.S. Atty., Greenville, S.C., Wesley D. Wedemeyer, Asst. U.S. Atty., St. Louis, Mo., for defendant.

MEMORANDUM
NANGLE, Chief Judge.

Introduction
Consolidated cases Numbers 86-689C(1), 86-691C(1), and 86-692C(1)[1] are now before the Court on the three identical motions for summary judgment of defendant National Credit Union Administration Board (NCUAB). In these three cases, plaintiff Jeffery Herbert, as the Trustee for certain trusts,[2] brought suit against the NCUAB because the NCUAB determined that three accounts which plaintiff established at the now-defunct Zionic Federal Credit Union (Zionic)[3] were not "member *835 accounts," and, thus, that there was no insurance coverage for these accounts under the Federal Credit Union Act from the National Credit Union Share Insurance Fund (NCUISF). By these three cases, plaintiff seeks a determination that these three accounts were "member accounts" and, thus, were insured under the Federal Credit Union Act.[4] The NCUAB filed the instant three identical motions for summary judgment contending that the NCUAB acted within its statutory discretion in denying insurance payout to plaintiff. The Court finds that, as a matter of law, the NCUAB properly denied insurance payout to plaintiff. Accordingly, the NCUAB's motions for summary judgment are granted. Numbers 86-689C(1), 86-691C(1), and 86-692C(1) are dismissed.

Zionic Federal Credit Union
On February 15, 1979, the NCUAB approved Zionic's organization certificate; Zionic was chartered as a Federal Credit Union. Zionic's charter field of membership was "limited to those [persons and entities] having the following common bond:"
Members of the Reorganized Church of Jesus Christ of Latter Day Saints who are church participants within the geographic boundaries, as of the date of this charter, of the East Central States Region; unremarried spouses of persons who died while within the field of membership of this credit union; employees of this credit union; members of their immediate families; and organizations of such persons.
Defendant's Exhibit 1; Plaintiff's Exhibit II. With the prior approval of the NCUAB to the amendment, on March 17, 1979, the Board of Directors of Zionic adopted the following amendment to Article III of Zionic's by-laws:
SECTION 6. Shares may be issued in a revocable or irrevocable trust, subject to the following:
(a) When shares are issued in a revocable trust, the settlor must be a member of this credit union in his/her own right, and the name of the beneficiary must be stated.
(b) When shares are issued in an irrevocable trust, the settlor or the beneficiary must be a member of this credit union in his/her own right, and the name of the beneficiary must be stated. For purposes of this section, shares issued pursuant to a pension plan authorized by the rules and regulations shall be treated as an irrevocable trust unless otherwise indicated in the rules and regulations.
(c) Trust accounts established prior to the effective date of this section shall not be affected. Trusts may be established pursuant to this section, provided such trusts, their terms and conditions are in accordance with the laws of this jurisdiction.
Defendant's Exhibit 11. Thereafter, Zionic applied for and, on February 13, 1983, the NCUAB approved, a charter amendment to Zionic's field of membership. Zionic's amended field of membership was "limited to those [persons and entities] having the following common bond:"
1. Members of the Reorganized Church of Jesus Christ of Latter Day Saints who are church participants within the geographic boundaries as of the *836 date of this charter of the East Central States Region;[5]
2. Members, employees, and associates of the National Family Institute, Inc. [NFI], National Youth Development Foundation, Inc. [NYDF], Missouri Inheritance, Inc. [MI], or Camp Personality, Inc. [CP], and their affiliated associations, trusts, and organizations;
3. Spouses of persons who died while within the field of membership of this credit union;
4. Employees of this credit union;
5. Members of their immediate families; and
6. Organizations of such persons.
Defendant's Exhibit 3; Plaintiff's Exhibit EE. The amendment added the underlined portion and eliminated the requirement that spouses of persons who died while within the field of membership still be unremarried.
On January 7, 1983, plaintiff Jeffery Herbert, in his individual capacity, opened account number 536 at Zionic. (Plaintiff's Exhibit G).[6]
In March, 1983, the NCUAB learned that Zionic had accepted as members certain entities or organizations which did not qualify for membership in Zionic under Zionic's approved field of membership. Thereafter, on May 18, 1983, Zionic and the NCUAB entered into a "MEMORANDUM OF AGREEMENT" which stated that Zionic's field of membership:
is exclusively limited to natural persons and organizations of natural persons otherwise eligible for membership. Specifically, it is understood that membership in [Zionic] is not available to organizations solely on the basis that they make donations to, do business with, provide services to, or otherwise deal with [NFI, NYDF, MI, or CP,] although said organization may nevertheless qualify for membership if composed entirely of natural persons otherwise eligible for membership.
(Defendant's Exhibit 5; Plaintiff's Exhibit JJ). The MEMORANDUM OF AGREEMENT acknowledges that Zionic had in fact accepted as members certain entities and organizations which did not qualify for membership. Thus, Zionic agreed (1) to cease accepting as members non-qualifying entities and organizations, and (2) to inform non-qualifying entities and organizations that their accounts were uninsured.
By letter dated June 20, 1983, through its attorney, Zionic, inter alia, requested that National Heritage Corporation (NHC) be considered for inclusion in Zionic's field of membership. (Defendant's Exhibit 7, ¶ 1). By letter dated July 21, 1983, the NCUAB informed Zionic's attorney that the NCUAB would consider an expansion of Zionic's field of membership to include NHC only after Zionic had fully complied with all the conditions contained in the parties MEMORANDUM OF AGREEMENT and after Zionic had corrected certain other *837 problems.[7] That letter further informed Zionic's attorney that the NCUAB would advise Zionic regarding the requirements for valid trust accounts. (Defendant's Exhibit 8). Zionic's attorney by letter dated August 15, 1983, responded by stating that Zionic would not engage in any questionable trust accounts. (Defendant's Exhibit 9). By letter dated September 26, 1983, the NCUAB informed Zionic's attorney that, pursuant to Section 119 of the Federal Credit Union Act, 12 U.S.C. § 1765, Zionic could "issue shares in trust subject to the conditions prescribed in" Zionic's by-laws. The NCUAB noted the existence of Article III, Section 6, of Zionic's by-laws. The NCUAB described the effect of 12 U.S.C. § 1765 and of Article III, Section 6, as follows: Zionic could issue shares for revocable trust accounts only if all the settlors were members of Zionic; Zionic could issue shares for irrevocable trust accounts only if either all the settlors or all the beneficiaries were members of Zionic. (Defendant's Exhibit 10).
On September 28, 1983, plaintiff Jeffery Herbert, acting as a Trustee, established account numbers 701, 702, and 703 at Zionic respectively for "HILLCREST ABBEY WEST, INC.," "SAVANNAH SECURITIES, INC., d/b/a Hillcrest Abbey and Mausoleum," and "MAGNOLIA MEMORIAL GARDENS, INC." (the "cemetery companies"). (Plaintiff's Exhibit F).
On June 6, 1984, the NCUAB placed Zionic into involuntary liquidation pursuant to its authority under 12 U.S.C. §§ 1766(b), 1786(h)(4)(B), and 1787(a)(1). (Defendant's Exhibit 12). On June 28, 1985, by letter the NCUAB informed plaintiff, through plaintiff's attorney, that the three cemetery companies were not within Zionic's amended field of membership and, thus, that the three accounts were not entitled to insurance. (Defendant's Exhibit 13).
On November 1, 1985, plaintiff filed the five now-consolidated cases in the United States District Court for the District of South Carolina, Anderson Division. On March 21, 1986, Judge Anderson ordered the five cases transferred to the United States District Court for the Eastern District of Missouri, Eastern Division. On May 15, 1986, this Court consolidated the five cases for discovery. On October 27, 1986, the National Credit Union Administration Board filed the instant motions for summary judgment.

Federal Credit Unions
A Federal credit union is "a cooperative association organized in accordance with the provisions of [the Federal Credit Union Act] for the purposes of promoting thrift among its members and creating a source of credit for provident or productive purposes." 12 U.S.C. § 1752(1). Seven or more natural persons together may apply to form a Federal credit union by filing an "organization certificate" with the NCUAB. 12 U.S.C. §§ 1753 & 1754. The NCUAB is charged with the responsibility for chartering Federal credit unions. The NCUAB must conduct an "appropriate investigation" and must determine if the "organization certificate" conforms to the provisions of "the Federal Credit Union Act." 12 U.S.C. § 1754. If the NCUAB approves the "organization certificate," it becomes the charter of the Federal credit union. 12 U.S.C. § 1754. The NCUAB must also approve the Federal credit union's by-laws. 12 U.S.C. § 1758.
Membership in a Federal credit union is "limited to groups having a common bond of occupation or association or to groups within a well-defined neighborhood, community or rural district." 12 U.S.C. § 1759. The "organization certificate" filed with the NCUAB must set forth with specificity "the proposed field of membership." 12 U.S.C. § 1753(5). In order to approve the "organization certificate," the NCUAB must determine that the proposed field of membership, as a necessary component of the "organization certificate," "conforms to the provisions of" the Federal Credit Union Act. 12 U.S.C. § 1754; see 12 U.S.C. § 1753. Specifically, the NCUAB must determine if the proposed field of membership conforms to the requirements of 12 U.S.C. § 1759. Upon NCUAB approval *838 of the "organization certificate," the field of membership is part of the Federal credit union's charter. 12 U.S.C. § 1754. As the NCUAB must approve the charter, the NCUAB must approve amendments to the charter, including amendments to the field of membership. 12 C.F.R. § 701.4. See 12 U.S.C. § 1754; Interpretive Ruling and Policy Statement, 82-3, 47 Fed.Reg. 26808 (June 22, 1982).
"Shares may be issued ... in trust, subject to such conditions as may be prescribed by the bylaws. When shares are issued in trust, the name of the beneficiary shall be disclosed to the Federal credit union." 12 U.S.C. § 1765. The NCUAB must approve a Federal credit union's by-laws. 12 U.S.C. § 1758. Thus, through its control of the by-laws, the NCUAB controls a Federal credit union's power to issue shares in trust. See 12 U.S.C. §§ 1758 & 1765.
The NCUAB must "insure the member accounts of all Federal credit unions." 12 U.S.C. § 1781(a). A "member account" of a credit union is a share, share certificate, or share draft account of a member of the credit union. 12 U.S.C. § 1752(5) (1986 supp.).[8] The NCUAB may place a Federal credit union into involuntary liquidation and may appoint itself as the liquidating agent for the credit union. 12 U.S.C. §§ 1766(b) & 1787(a). Whenever the NCUAB closes an insured Federal credit union for liquidation because of the credit union's bankruptcy or insolvency, the NCUAB must pay "the insured accounts of such credit union." 12 U.S.C. § 1787(c)(1). "[T]he term `insured account' means the total amount of the account in the member's name (after deducting offsets) less any part thereof which is in excess of $100,000." 12 U.S.C. § 1787(c)(1). The "Board may define ... the extent of the insurance coverage provided for member accounts, including member accounts in the name of a minor, in trust, or in joint tenancy." Id. The NCUAB promulgated regulations at 12 C.F.R. part 745. These regulations do not help in the determination of whether the NCUAB's membership determination or insurance claim decision in the instant case was correct. Further,
The Board, in its discretion, may require proof of claims to be filed before paying the insured accounts, and in any case where it is not satisfied as to the validity of a claim for an insured account, it may require the final determination of a court of competent jurisdiction before paying such claim.
12 U.S.C. § 1787(c)(1).
Thus, the NCUAB insures accounts of members of the credit union, 12 U.S.C. § 1781(a); the member's "insured account" is that portion of his account up to $100,000, 12 U.S.C. § 1787(c)(1); and the NCUAB must pay to the member the amount of his insured account, Id.; but the NCUAB has discretion to require proof of claims before it pays the claim for an insured account, and the NCUAB has discretion to require the determination of a court before it pays the claim for an insured account. Id.

The Three Trust Accounts
Pursuant to 12 U.S.C. § 1765, Zionic could issue shares in trust only upon compliance with the conditions contained in Zionic's by-laws. Zionic's by-laws provided that for revocable trusts the settlor(s) must be member(s) of Zionic in their own right. By-Laws Article III, Section 6(a). Zionic's by-laws provided that for irrevocable trusts either the settlor(s) or the beneficiary(ies) must be member(s) of Zionic in their own right. By-Laws, Article III, Section 6(b).
The three "Perpetual Care Trust Funds" of the cemetery companies were irrevocable trusts. (Trust Agreements; Plaintiff's Exhibit B). The settlors of the three trusts were the cemetery companies. It is unclear who the beneficiaries of the three trusts were, but they were either the cemetery companies or the persons who purchased perpetual care from the cemetery companies. Plaintiff does not contend that the persons who purchased perpetual care *839 were members of Zionic in their own right. Plaintiff does not base his claim that the three trust accounts were valid member accounts on the identity of the persons who purchased perpetual care. Rather, plaintiff bases his claim that the three trust accounts were valid member accounts on his contention that the three cemetery companies, the settlors of the trusts, were valid members of Zionic. See Zionic's By-Laws, Article III, Section 6(b).
If Hillcrest Abbey West, Inc., Savannah Securities, Inc., d/b/a Hillcrest Abbey and Mausoleum, and Magnolia Memorial Gardens, Inc., were valid members of Zionic, then the NCUAB had a duty to insure the trust accounts established for them. See 12 U.S.C. §§ 1781(a), 1787(c)(1), & 1765; Zionic's By-Laws, Article III, Section 6(b). However, the NCUAB determined that Hillcrest, Savannah, and Magnolia were not valid members of Zionic. Thus, the NCUAB determined that the trust accounts established for them at Zionic were not member accounts, were not insured accounts, and that it had no duty to pay insurance to plaintiff, as trustee, on the three trust accounts. Rather, the NCUAB exercised its discretion to require plaintiff to obtain a determination from a court that the NCUAB is required to pay the insurance claims on the three accounts. See 12 U.S.C. § 1787(c)(1).

Standard of Review
The NCUAB argues that the Court should review the NCUAB's decision to deny plaintiff's insurance claims pursuant to the "arbitrary, capricious or otherwise not in accordance with law" standard ("arbitrariness review"). Plaintiff argues that the Court should engage in a de novo review of the NCUAB's decision. For the reasons set forth below, the Court concludes that the NCUAB's decision to deny plaintiff's insurance claims is subject to de novo review in this Court.

1. The Federal Credit Union Act.
With respect to the NCUAB's decisions regarding its duty to pay insurance claims, the Federal Credit Union Act provides:
The Board, in its discretion, may require proof of claims to be filed before paying the insured accounts, and in any case where it is not satisfied as to the validity of a claim for an insured account, it may require the final determination of a court of competent jurisdiction before paying such claim.
12 U.S.C. § 1787(c)(1) (emphasis added). The NCUAB points to the emphasized portion and argues that the NCUAB's decision to deny an insurance claim is a discretionary decision. Thus, the NCUAB concludes that its decision to deny an insurance claim is subject only to arbitrariness review. The Court does not agree. Under the above-quoted portion of 12 U.S.C. § 1687(c)(1), the NCUAB has discretion: (1) to require proof of a claim before paying insurance, and (2) to require a final determination of a court before paying an insurance claim. These decisions are subject to arbitrariness review. The Court concludes that the above-quoted portion of 12 U.S.C. § 1787(c)(1) does not support the NCUAB's argument that its decision to deny insurance claims is a discretionary decision subject only to arbitrariness review.
The NCUAB has cited no cases, and the Court can find none, addressing what the appropriate standard for reviewing an NCUAB insurance claim decision under 12 U.S.C. § 1787(c)(1) is. The Court has examined the legislative history of the Federal Credit Union Act, and of amendments thereto, and finds no guidance as to what Congress intended the appropriate standard of review to be. See 1970 U.S.Code Cong. and Adm.News 4166, 4172, 4184. See also 1974 U.S.Code Cong. and Adm. News 6119; 1978 U.S.Code Cong. and Adm. News 9273.
In contrast to NCUAB insurance decisions under 12 U.S.C. § 1787(c)(1), the Court notes that, elsewhere in the Federal Credit Union Act, Congress explicitly requires the NCUAB to hold hearings regarding its decisions, see e.g. 12 U.S.C. § 1786(b)(1), (e)(1), (g)(5), and (i)(3), and has explicitly channeled review of some NCUAB decisions into the Administrative Procedures Act (APA), 5 U.S.C. § 701 et seq. See 12 U.S.C. § 1786(j). The NCUAB *840 does not hold hearings concerning, and the NCUAB has not promulgated any rules concerning review of, its insurance claim decisions under 12 U.S.C. § 1787(c)(1). In contrast, the Court notes that the NCUAB has promulgated rules regarding the hearings to be held under 12 U.S.C. § 1786. See 12 C.F.R. part 747. These regulations direct persons to seek review pursuant to the APA. 12 C.F.R. § 747.915(b). Review pursuant to the APA is arbitrariness review. 5 U.S.C. § 706. See Board of Directors and Officers, Forbes Federal Credit Union v. National Credit Union Administration, 477 F.2d 777 (10th Cir.), cert. denied, 414 U.S. 924, 94 S.Ct. 233, 38 L.Ed.2d 158 (1973).
It is clear that, in enacting the Federal Credit Union Act, Congress knew how to direct persons to seek review of NCUAB decisions pursuant to the APA; Congress knew how to provide only for arbitrariness review. Section 1787(c)(1) does not direct persons to seek review pursuant to the APA and does not explicitly provide only for arbitrariness review. Thus, the Court concludes that the language of § 1787(c)(1) does not support the NCUAB's argument that its insurance claim decisions are subject only to arbitrariness review akin to that provided under the APA.
The NCUAB cites several cases in which courts reviewed NCUAB discretionary decisions, regulations, interpretations of the Federal Credit Union Act, and orders pursuant to the arbitrariness standard. See e.g. Board of Directors and Officers, Forbes Federal Credit Union v. National Credit Union Administration, 477 F.2d 777 (10th Cir.), cert. denied, 414 U.S. 924, 94 S.Ct. 233, 38 L.Ed.2d 158 (1973). The Court concludes that these cases do not support the NCUAB's argument that its insurance claim decisions under § 1787(c)(1) are discretionary decisions subject only to arbitrariness review.

2. The FDIC and the FSLIC.
To support its argument that NCUAB insurance claim decisions are subject only to arbitrariness review, the NCUAB cites decisions involving the Federal Deposit Insurance Corporation (FDIC) and the Federal Savings and Loan Insurance Corporation (FSLIC).
The FDIC insures certain deposits up to $100,000 ("insured deposits") in certain insured banks. 12 U.S.C. § 1821(a)(1) and (f). If an insured bank is closed because it does not meet the demands of its depositors, the FDIC must pay "insured deposits." Similarly to the NCUAB pursuant to § 1787(c)(1), the FDIC pursuant to § 1821(f):
in its discretion, may require proof of claims to be filed before paying the insured deposits, and that in any case where the Corporation is not satisfied as to the validity of a claim for an insured deposit, it may require the final determination of a court of competent jurisdiction before paying such claim.
12 U.S.C. § 1821(f).
Likewise, the FSLIC insures certain deposits up to $100,000 ("insured accounts") in certain insured institutions. 12 U.S.C. § 1728(a). If an insured institution is in default, the FSLIC must pay "insured accounts." Similarly to the NCUAB pursuant to § 1787(c)(1) and to the FDIC pursuant to § 1821(f), the FSLIC pursuant to § 1728(b):
in its discretion, may require proof of claims to be filed before paying the insured accounts, and that in any case where the Corporation is not satisfied as to the validity of a claim for an insured account, it may require the final determination of a court of competent jurisdiction before paying such claim.
12 U.S.C. § 1728(b).[9]
The language in 12 U.S.C. § 1728(b) (FSLIC) and in 12 U.S.C. § 1821(f) (FDIC) *841 providing for the final determination of insurance claims in a court of competent jurisdiction is identical to the language in 12 U.S.C. § 1787(c)(1) (NCUAB). Therefore, the Court concludes that the same standard should apply in reviewing the insurance claim decisions of the NCUAB, the FSLIC, and the FDIC. See M. Cobb, Federal Regulation of Depository Institutions; Enforcement Powers and Procedures ¶ 8.05, pp. 8-19 through 8-23 (1984). Thus, the Court will examine case law reviewing insurance claim decisions of the FSLIC and the FDIC.
The NCUAB cites Baskes v. Federal Savings and Loan Insurance Corp., 649 F.Supp. 1358 (N.D.Ill.1986), in support of its position that NCUAB insurance claim decisions under 12 U.S.C. § 1787(c)(1) should be reviewed pursuant to the arbitrariness standard.
In Baskes, the FSLIC denied Baskes' claims for insurance on two accounts. 649 F.Supp. at 1361. Baskes sought review within the FSLIC pursuant to 12 C.F.R. § 564.1(d). Thence, after exhausting his administrative remedies, Baskes sought review in federal district court pursuant to the APA. The district court reviewed the FSLIC insurance claim decision pursuant to the arbitrariness standard set forth in the APA, 5 U.S.C. § 706. 649 F.Supp. at 1361.
In contrast, Jugum v. Federal Savings and Loan Insurance Corp., 637 F.Supp. 1045, reconsideration denied, 646 F.Supp. 764 (W.D.Wash.1986), concluded that the appropriate standard of judicial review of an FSLIC insurance claim decision is de novo review. 637 F.Supp. at 1046-1048. The court so concluded despite the existence of FSLIC promulgated regulations at 12 C.F.R. § 564.1(d). See 637 F.Supp. at 1047-1048 & nn. 3 & 4.
In Godwin v. Federal Savings and Loan Insurance Corp., 806 F.2d 1290 (5th Cir. 1987), plaintiffs brought suit against the FSLIC to recover the uninsured balance of a testamentary trust account for five minors. Pursuant to 12 U.S.C. § 1728(b), the FSLIC determined that there were only three proper beneficiaries. Thus, the FSLIC, pursuant to 12 U.S.C. § 1728(b), paid plaintiffs $100,000 for each of the three beneficiaries for a total of $300,000, but denied insurance coverage for the balance of $42,914.30. 806 F.2d at 1292. The district court dismissed plaintiffs' suit and held: (1) "that the FSLIC's determination on insurance must be challenged by seeking review pursuant to the [APA]," and (2) "that a de novo review of the FSLIC's determination was foreclosed by ... North Mississippi Savings & Loan Association v. Hudspeth, 756 F.2d 1096 (5th Cir.1985), cert. denied, 474 U.S. 1054, 106 S.Ct. 790, 88 L.Ed.2d 768 (1986)." 806 F.2d at 1292. The Fifth Circuit affirmed on procedural grounds but stated at footnote 4:
In Hudspeth we held that a de novo examination of the FSLIC's insurance determination is foreclosed by the existence of administrative procedures that must be exhausted. 756 F.2d at 1103.
Godwin v. Federal Savings and Loan Insurance Corp., 806 F.2d 1290, 1292 n. 4 (5th Cir.1987).
In North Mississippi Savings & Loan Association v. Hudspeth, 756 F.2d 1096 (5th Cir.1985), cert. denied, 474 U.S. 1054, 106 S.Ct. 790, 88 L.Ed.2d 768 (1986), defendant and counterclaimant Hudspeth was the president of plaintiff and counterclaim defendant North Mississippi ("Old North"). Old North, in order to obtain FSLIC insurance, replaced Hudspeth as president. Old North allegedly agreed to pay Hudspeth deferred compensation. Then, Old North went into receivership. The FSLIC formed New North. The FSLIC caused Old North to transfer to New North "all of its assets and all liabilities except Old North's liabilities to its shareholders and any obligation owed by Old North under a compensation agreement such as Hudspeth's. The FSLIC, as receiver of Old North, then terminated all such agreements and stopped the payments to Hudspeth." 756 F.2d at 1099. Old North filed a declaratory judgment action against Hudspeth seeking "a declaration that [the] agreement with Hudspeth either did not exist or was terminable. Hudspeth counterclaimed for specific performance or damages for breach of contract." Id. Hudspeth held that Hudspeth *842 could not pursue his creditor contract claim against Old North, either in state or in federal court, until he had exhausted administrative remedies available under the APA. 756 F.2d at 1103.[10]
To this Court, it appears that Godwin v. Federal Savings and Loan Insurance Corp., 806 F.2d 1290, 1292 n. 4 (5th Cir. 1987), wholly misstates the holding in Hudspeth. Hudspeth does not in any way involve an FSLIC insurance claim decision under 12 U.S.C. § 1728(b). See 756 F.2d at 1099. Thus, Godwin's conclusory dictum that de novo review of FSLIC insurance determinations is foreclosed by the existence of administrative procedures that must be exhausted, 806 F.2d at 1292 & n. 4, is undermined to the extent Godwin relied upon Hudspeth. Nevertheless, the Court will assume that the Fifth Circuit would take the position stated in footnote 4 of Godwin.
Other courts, though without stating their standard of review, appear to have engaged in de novo review of FSLIC or FDIC insurance claim decisions. See Philadelphia Gear Corp. v. Federal Deposit Insurance Corp., 751 F.2d 1131 (10th Cir. 1984), reversed, 476 U.S. 426, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986) (both the Tenth Circuit and the Supreme Court appear to have engaged in de novo review of FDIC decision to deny insurance claim under § 1821(f)); First Empire Bank v. Federal Deposit Insurance Corp., 572 F.2d 1361 (9th Cir.), cert. denied, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978) (appears to be de novo review of FDIC decision to deny insurance claim under § 1821(f)); Federal Savings and Loan Association v. Huttner, 265 F. Supp. 40 (N.D.Ill.1967), aff'd, 401 F.2d 58 (7th Cir.1968) (in declaratory judgment action brought by FSLIC, appears to be de novo review of FSLIC determination that certain dividends were not insured).

3. Discussion.
The FSLIC has promulgated regulations providing internal administrative procedures and remedies for review of FSLIC insurance claim decisions. See 12 C.F.R. § 564.1(d). In Baskes v. Federal Savings and Loan Insurance Corp., 649 F.Supp. 1358 (N.D.Ill.1986), the court reviewed the FSLIC's final insurance claim decision pursuant to the APA arbitrariness standard bacause Baskes had sought review of the FSLIC's final 12 C.F.R. § 564.1(d) decision pursuant to the APA. 649 F.Supp. at 1361. The court declined to conduct de novo review because it viewed Baskes' complaint as an APA action to review the FSLIC's final administrative decision made pursuant to 12 C.F.R. § 564.1(d). 649 F. Supp. at 1362. Baskes does not discuss that portion of 12 U.S.C. § 1728(b) which states that a court is to make the "final determination" as to the "validity of a claim" for insurance.
In contrast to the FSLIC, the NCUAB has not promulgated regulations providing internal administrative procedures and remedies for review of NCUAB insurance claim decisions. See 12 C.F.R. parts 700 through 795 (1985 and 1986). As occurred in the instant case, if the NCUAB denies a claimant's insurance claim, then the claimant can sue in federal district court pursuant to 12 U.S.C. § 1787(c)(1) immediately.
In Jugum v. Federal Savings and Loan Insurance Corp., 637 F.Supp. 1045 (W.D. Wash.1986), the FSLIC argued that Congress had waived the FSLIC's sovereign immunity only to the extent provided in the APA and that the FSLIC's insurance claim decision should be reviewed under the APA arbitrariness standard. While noting the existence of the regulations at 12 C.F.R. § 564.1, the court rejected the FSLIC's arguments and held that the FSLIC's insurance claim decisions are subject to de novo review in an action brought pursuant to 12 U.S.C. § 1728(b). 637 F.Supp. at 1046-1048.
Jugum based its conclusion that the court's 12 U.S.C. § 1728(b) "final determination" is to be a de novo determination on *843 the following: (1) the fact that the FSLIC has the power "to sue and be sued ... in any court of competent jurisdiction in the United States," 12 U.S.C. § 1725(c)(4); (2) the fact that, as the FSLIC is in the insurance business, it has "accepted the ordinary incidents of suits in that business;" (3) the existence of 12 U.S.C. § 1728(b) and (c); (4) the fact that 12 U.S.C. § 1728(b) and (c) do not require exhaustion of administrative remedies before a claimant can bring suit for payment of insurance after the FSLIC has denied a claim; (5) the court's conclusion that the language of 12 U.S.C. § 1728(b) and (c) imply an independent action to recover for the insurance, rather than a mere review of an administrative decision; and (6) "the limited administrative procedures for relief available to FSLIC claimants." 637 F.Supp. at 1048.
This Court does not find Baskes persuasive. Likewise, this Court does not find Godwin v. Federal Savings and Loan Insurance Corp., 806 F.2d 1290, 1292 n. 4 (5th Cir.1987), persuasive. Rather, this Court finds the analysis in Jugum persuasive as applied to the NCUAB. For reasons substantially similar to those set forth in Jugum, this Court concludes that this Court's "final determination" as to the "validity of a claim" for insurance under 12 U.S.C. § 1787(c)(1) is a de novo determination.
First, Congress has expressly provided that the NCUAB may "sue and be sued ... in any court of law or equity, State or Federal." 12 U.S.C. § 1789(a)(2). Likewise, 12 U.S.C. § 1787(c)(1) provides for court determination as to the validity of insurance claims. Thus, Congress did not waive the NCUAB's sovereign immunity only to the extent provided in the APA.
Second, by providing insurance for credit union member accounts, the NCUAB is in the insurance business. Thus, the NCUAB has accepted the ordinary incidents of suits in that business. North New York Savings Bank v. Federal Savings and Loan Insurance Corp., 515 F.2d 1355, 1364 (D.C. Cir.1975). As an insurer, the NCUAB's insurance claim decisions should be subject to more stringent review than arbitrariness review.
Third, 12 U.S.C. § 1781(a) requires that the NCUAB insure member accounts. Likewise, 12 U.S.C. § 1787(c)(1) requires that the NCUAB pay insurance on member accounts. The NCUAB's obligations under §§ 1781(a) and 1787(c)(1) to insure member accounts and to pay insurance on member accounts are mandatory. The NCUAB has no discretion as to these obligations. The NCUAB's discretion under § 1787(c)(1) is limited to requiring proof of claims (including proof of membership) and to requiring the final determination of a court.
Fourth, 12 U.S.C. § 1787(c)(1) vests in a court the "final determination" as to the "validity of a claim" for insurance. This language in 12 U.S.C. § 1787(c)(1) implies that a court independently determines or decides whether an insurance claim is valid. This language is fully consistent with a de novo review or determination and is not consistent with a mere arbitrariness review of an administrative decision.
Fifth, the Federal Credit Union Act, and specifically 12 U.S.C. § 1787(c)(1), does not require exhaustion of any administrative remedies before bringing an action to recover payment for insurance under 12 U.S.C. § 1787(c)(1). After an insurance claim is denied, a claimant may sue in federal court. Further, the NCUAB has not promulgated any administrative review procedures. Moreover, in contrast to other NCUAB decisions under the Federal Credit Union Act, Congress did not statutorily channel review of NCUAB insurance claim decisions into the APA.
Sixth, the existent NCUAB administrative procedures provide very limited relief to insurance claimants.

4. Conclusion.
Upon consideration of the Federal Credit Union Act, and specifically 12 U.S.C. § 1787(c)(1), and upon consideration of case law involving the FDIC and the FSLIC, this Court concludes that, in an action brought pursuant to 12 U.S.C. § 1787(c)(1) by a claimant to recover payment for insurance from the NCUAB, the Court's "final determination" *844 as to the "validity of a claim" for insurance is an independent determination. Thus, the claimant is entitled to a de novo determination of the validity of the claim and de novo review of the NCUAB's insurance claim decision.

Summary Judgment
As the Court's final determination as to the validity of plaintiff's insurance claims is a de novo determination, the normal summary judgment standard applies. Under Rule 56 of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if he can "show that there is no genuine issue as to any material fact and that [he] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). See also Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Williams v. City of St. Louis, 783 F.2d 114, 115 (8th Cir.1986). The burden of proof is on the moving party to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Summary judgment is an extreme remedy. A court should not grant a summary judgment motion unless the movant has established its right to a judgment with such clarity as to leave no room for controversy and unless the court is convinced that the other party is not entitled to recover under any discernible circumstances. Foster v. Johns-Manville Sales Corp., et al., 787 F.2d 390, 392 (8th Cir.1986). In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the opposing party and must give that party the benefit of all reasonable inferences to be drawn from the facts. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 1356-1357, 89 L.Ed.2d 538 (1986); Kegel v. Runnels, 793 F.2d 924, 926 (8th Cir.1986); Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). Yet, "where the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no `genuine issue for trial'." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Further, under Rule 56(e), a party opposing a motion for summary judgment may not rest upon the allegations of his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). See also 10A Wright, Miller and Kane, Federal Practice and Procedure, § 2739 (1983).
Pursuant to 12 U.S.C. §§ 1765 and 1781(a), and Zionic's By-Laws, Article III, Section 6(b), the three trust accounts at issue were valid member accounts and insured accounts only if the three cemetery companies, as settlors of the trusts, were valid members of Zionic. Plaintiff contends that the three cemetery companies were valid members of Zionic pursuant to paragraph 2 of Zionic's amended field of membership.
As noted above, as of February 13, 1983, Zionic's amended field of membership was "limited to those [persons and entities] having the following common bond:"
1. Members of the Reorganized Church of Jesus Christ of Latter Day Saints who are church participants within the geographic boundaries as of the date of this charter of the East Central States Region;
2. Members, employees, and associates of the National Family Institute, Inc. [NFI], National Youth Development Foundation, Inc. [NYDF], Missouri Inheritance, Inc. [MI], or Camp Personality, Inc. [CP], and their affiliated associations, trusts, and organizations;
3. Spouses of persons who died while within the field of membership of this credit union;
4. Employees of this credit union;
5. Members of their immediate families; and
6. Organizations of such persons.
The NCUAB and plaintiff agree that the following persons were eligible for membership in Zionic by virtue of paragraph 2: members, employees, and associates of NFI, NYDF, MI, and CP. The three cemetery companies were not within that group of persons. Further, the three cemetery *845 companies were not "organizations of such persons." (Paragraph 6 of Zionic's amended field of membership).
Plaintiff contends that, by virtue of that portion of paragraph 2 which provides "and their affiliated associations, trusts, and organizations," the following entities were also eligible for membership in Zionic by virtue of paragraph 2: the affiliated associations, trusts, and organizations of NFI, NYDF, MI, and CP. As noted above at footnote 6, NFI owned one-half of the stock of National Heritage Corporation and National Heritage Corporation owned the cemetery companies. Thus, arguably, the cemetery companies are affiliated organizations of NFI. On this reading of paragraph 2 and on this tenuous affiliation, plaintiff contends that the three cemetery companies were eligible for membership in Zionic by virtue of paragraph 2.
The NCUAB contends that plaintiff misreads paragraph 2. The NCUAB contends that paragraph 2 does not make those affiliated associations, trusts, and organizations eligible for membership in Zionic. The NCUAB contends that the "and their affiliated associations, trusts, and organizations" portion of paragraph 2 makes the following persons eligible for membership in Zionic: the members, employees, and associates of the affiliated associations, trusts, and organizations of NFI, NYDF, MI, and CP. The three cemetery companies were not such persons and were not organizations of such persons. The NCUAB therefore concludes that the three cemetery companies were not within the group of persons or entities eligible for membership in Zionic by virtue of paragraphs 2 and 6. The NCUAB further contends that, under plaintiff's reading of paragraph 2, the three cemetery companies' tenuous affiliation to NFI does not satisfy the "affiliated" requirement.[11]
Essentially, the NCUAB contends that paragraph 2 makes the following persons eligible for membership in Zionic: (1) "members, employees, and associates of" NFI, NYDF, MI, and CP, and (2) "members, employees, and associates of" the affiliated associations, trusts, and organizations of NFI, NYDF, MI, and CP. In contrast, plaintiff contends that paragraph 2 makes eligible for membership in Zionic the following: (1) "members, employees, and associates of" NFI, NYDF, MI, and CP, and (2) all affiliated associations, trusts, and organizations of NFI, NYDF, MI, and CP. The Court finds plaintiff's reading of paragraph 2 untenable. The Court concludes that paragraph 2 can reasonably be construed only according to the NCUAB's reading. Thus, the three cemetery companies were not eligible for membership in Zionic by virtue of paragraph 2 of Zionic's amended field of membership. Thus, the three cemetery companies were not valid members of Zionic, the three trust accounts were not member accounts, and the three trust accounts were not insured accounts. Therefore, the NCUAB properly denied insurance to plaintiff for the three accounts.
Plaintiff's reading of paragraph 2 is untenable, and the NCUAB's reading of paragraph 2 is the only reasonable construction thereof, for the following reasons. First, paragraphs 1 through 5 all refer to certain persons who are "members," "employees," "associates," or "spouses" of certain organizations or other persons. Paragraph 6 provides that "organizations of such persons" are eligible for membership in Zionic. The "such persons" refers to the persons eligible for membership by virtue of paragraphs 1 through 5. Thus, paragraphs 1 through 5 provide that certain persons are eligible for membership in Zionic.
Second, the first word or words of each paragraph sets forth the general characteristics of the person or entity to whom the remainder of the paragraph refers. Paragraph 1 applies to persons who are "members" of something. Paragraph 2 applies to "members, employees, and associates" *846 of something. Paragraph 3 applies to "spouses" of some persons. Paragraph 4 applies to "employees" of something. Paragraph 5 applies to "members" of something. Paragraph 6 applies to "organizations" of some persons. The persons or entity mentioned before the first "of" of each paragraph must be a member, employee, associate, spouse, or organization of the organizations, entities, or groups of persons following the "of." Thus, paragraph 2 makes eligible for membership in Zionic (1) members, employees, and associates of NFI, NYDF, MI, and CP, and (2) members, employees, and associates of the affiliated associations, trusts, and organizations of NFI, NYDF, MI, and CP.
Third, plaintiff's reading of paragraph 2 would make eligible for membership in Zionic: (1) members, employees, and associates of NFI, NYDF, MI, and CP, and (2) the affiliated associations, trusts, and organizations of NFI, NYDF, MI, and CP. Yet, paragraph 2 would not make NFI, NYDF, MI, and CP eligible for membership in Zionic. These organizations would be eligible for membership in Zionic only if they were organizations of the persons eligible for membership in Zionic. (Paragraph 6 of Zionic's amended field of membership). Thus, under plaintiff's reading, NFI, NYDF, MI, and CP are not directly eligible for membership in Zionic, but these organizations' affiliated associations, trusts, and organizations are directly eligible. This is not a reasonable reading of paragraph 2.
Fourth, the MEMORANDUM OF AGREEMENT between Zionic and the NCUAB explicitly sets forth the NCUAB's present reading of paragraph 2. The MEMORANDUM OF AGREEMENT stated that Zionic's amended field of membership:
is exclusively limited to natural persons and organizations of natural persons otherwise eligible for membership. Specifically, it is understood that membership in [Zionic] is not available to organizations solely on the basis that they make donations to, do business with, provide services to, or otherwise deal with [NFI, NYDF, MI, or CP,] although said organization may nevertheless qualify for membership if composed entirely of natural persons otherwise eligible for membership.
This MEMORANDUM confirms that paragraph 2 makes only persons eligible for membership in Zionic, namely, members, employees, and associates of certain organizations. This MEMORANDUM confirms that paragraph 6 makes organizations eligible for membership in Zionic if they are organizations of the persons referred to in paragraphs 1 through 5. Likewise, the correspondence between the NCUAB and Zionic from March of 1983 to September of 1983 confirms that paragraph 2 makes only persons eligible for membership in Zionic.
Fifth, on June 20, 1983, Zionic requested that National Heritage Corporation be considered for inclusion in Zionic's field of membership. (Defendant's Exhibit 7). Thus, as of June 20, 1983, Zionic understood that paragraph 2 did not make NHC eligible for membership in Zionic. As the three cemetery companies base their claim to eligibility on NHC's ownership of the three cemetery companies, Zionic also impliedly understood that paragraph 2 did not make the three cemetery companies eligible for membership in Zionic.
Sixth, on November 18, 1982, National Family Institute by letter addressed to the NCUAB requested that members of NFI be included in Zionic's field of membership. (Defendant's Exhibit 4). By similar letters addressed to the NCUAB, all dated November 18, 1982, Camp Personality, Missouri Inheritance, and National Youth Development Foundation also requested that their members be included in Zionic's field of membership. (Defendant's Exhibit 4). Along with these letters, Zionic by letter addressed to the NCUAB, also dated November 18, 1982, requested the addition of paragraph 2 so that the members of NFI, NYDF, MI, and CP would be included in Zionic's field of membership. (Defendant's Exhibit 4). These requests resulted in the addition of paragraph 2. (Defendant's Exhibit 3). As paragraph 2 was added in response to the requests of NFI, et al., to include their members in Zionic's field of membership, paragraph 2 does just that. Paragraph 2 includes NFI, et al.'s members in Zionic's field of membership.
*847 Seventh, Zionic's mailing address was: "P.O. Box 635, Bridgeton, MO. 63044." Zionic's telephone number was: "XXX-XXX-XXXX." National Family Institute's mailing address was: "P.O. Box 635, Bridgeton, MO. 63044." NFI's telephone number was: "XXX-XXX-XXXX." (Defendant's Exhibit 4).[12] There was clearly a close affiliation between Zionic and NFI. The three cemetery companies base their claim to eligibility for membership in Zionic on their affiliation to NFI. Based upon NFI's close affiliation to Zionic and the three cemetery companies affiliation to NFI, the Court concludes that it is fair to consider the documents passing between the NCUAB and Zionic, and between the NCUAB and NFI, in interpreting paragraph 2 as it applies to the three cemetery companies.
For the foregoing reasons, the Court concludes that there is only one reasonable construction of paragraph 2. Namely, paragraph 2 provides that: members, employees, and associates, of NFI, NYDF, MI, and CP are eligible for membership in Zionic; and that members, employees, and associates of the affiliated associations, trusts, and organizations of NFI, NYDF, MI, and CP are eligible for membership in Zionic. Only persons were eligible for membership in Zionic by virtue of paragraph 2. Organizations, such as the three cemetery companies, were not eligible for membership in Zionic by virtue of paragraph 2. On the basis of the documents presented to the Court, the Court concludes that, giving plaintiff the benefit of all reasonable inferences to be drawn from the facts, a rational trier of fact could not find for plaintiff. A rational trier of fact would find the NCUAB's reading of paragraph 2 to be the correct construction thereof. Therefore, there is no genuine issue for trial. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 1356-1357, 89 L.Ed.2d 538 (1986). The NCUAB has shown that, as a matter of law, the three cemetery companies were not within Zionic's amended field of membership, and that the three trust accounts were not valid member accounts and were not insured accounts. Therefore, the NCUAB properly denied plaintiff's insurance claims. Thus, the NCUAB has shown that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Accordingly, the NCUAB's motions for summary judgment are granted and plaintiff's complaints in Numbers 86-689C(1), 86-691C(1), and 86-692C(1) are dismissed.[13]
NOTES
[1] Numbers 86-689C(1), 86-691C(1), and 86-692C(1) are also consolidated with Numbers 86-688C(1) and 86-690C(1). The defendant in 86-689C(1), 86-691C(1), and 86-692C(1) is the National Credit Union Administration Board. The defendant in 86-688C(1) and 86-690C(1) is the National Deposit Guaranty Corporation. All five cases involve three similar accounts established by plaintiff at the Zionic Federal Credit Union. However, the resolution of Numbers 86-689C(1), 86-691C(1), and 86-692C(1) is independent of Numbers 86-688C(1) and 86-690C(1). In contrast, the resolution of Numbers 86-688C(1) and 86-690C(1) may be dependent, in part, upon the resolution of Numbers 86-689C(1), 86-691C(1), and 86-692C(1). Thus, the Court will consider Numbers 86-689C(1), 86-691C(1), and 86-692C(1) first and without reference to Numbers 86-688C(1) and 86-690C(1).
[2] In Number 86-689C(1), plaintiff is acting as the Trustee for "Savannah Securities, Inc., d/b/a Hillcrest Abbey and Mausoleum, a corporation." In Number 86-691C(1), plaintiff is acting as the Trustee for "Magnolia Memorial Gardens, Inc." In Number 86-692C(1), plaintiff is acting as the Trustee for "Hillcrest Abbey West, Inc., a corporation."
[3] Plaintiff, acting as a trustee, established at Zionic: (1) account number 701 for "HILLCREST ABBEY WEST, INC.," depositing $110,005.96 into the account; this account is the subject of Numbers 86-688C(1) and 86-692C(1); (2) account number 702 for "SAVANNAH SECURITIES, INC., d/b/a Hillcrest Abbey and Mausoleum," depositing $141,482.46 into the account; this account is the subject of Numbers 86-689C(1) and 86-690C(1); and (3) account number 703 for "MAGNOLIA MEMORIAL GARDENS, INC.," depositing $20,919.40 into the account; this account is the subject of Number 86-691C(1).
[4] In Numbers 86-688C(1) and 86-690C(1), plaintiff, as the Trustee for two of the trusts, brought suit against National Deposit Guaranty Corporation (Guaranty), an Ohio corporation, because Guaranty determined that there was no insurance coverage for account numbers 701 and 702 under an insurance policy issued by Guaranty to Zionic. The National Credit Union Act insures "member accounts" up to $100,000. 12 U.S.C. §§ 1781(a) and 1787(c)(1). Guaranty issued to Zionic a certificate stating that "Deposit Accounts In Excess of" the NCUA $100,000 insurance limit are "Totally Insured." Apparently, as plaintiff deposited in excess of $100,000 only into account numbers 701 and 702, plaintiff sought insurance coverage from Guaranty only for those two accounts. Thus, account numbers 701 and 702 are the subjects of suits against both the NCUAB and Guaranty, while account number 703 is the subject of suit only against the NCUAB.
[5] The "East Central States Region" is a geographic area surrounding St. Louis, Missouri, including all of Indiana and parts of Illinois, Missouri, Arkansas, Kentucky, and Michigan. (Record of action on proposed Zionic Federal Credit Union, Defendant's Exhibit 2, p. 2; Carver affidavit ¶ 6).
[6] The validity of Jeffery Herbert's membership in Zionic in his individual capacity, though not relevant to the determination of the issues in these cases, is far from clear. At the time of his application for membership in Zionic, Mr. Herbert was a resident of South Carolina. (Plaintiff's Exhibit G). Thus, as Mr. Herbert was not a church participant within Zionic's field of membership geographic boundary, Mr. Herbert was not within Zionic's amended field of membership paragraph 1 on the basis of his membership in the Reorganized Church of Jesus Christ of Latter Day Saints. However, Mr. Herbert was the Trustee of the three cemetery trust accounts at issue in these cases. Thus, Mr. Herbert probably was an employee or associate of the cemetery companies. National Heritage Corporation owned the cemetery companies. National Family Institute (NFI) owned one-half of the stock of National Heritage Corporation. Thus, the cemetery companies were arguably affiliated associations, trusts, or organizations of NFI. Thus, Mr. Herbert was arguably an employee or associate of an affiliated association, trust, or organization of NFI. If Mr. Herbert was such an employee or associate, then he was within Zionic's amended field of membership paragraph 2.
[7] The NCUAB never approved an expansion of Zionic's field of membership to include NHC.
[8] In the case of a credit union serving predominantly low-income members, a "member account" of a credit union is also a share, share certificate, or share draft account of a nonmember served by the credit union. 12 U.S.C. § 1752(5) (1986 supp.).
[9] Further, 12 U.S.C. § 1728(c) provides that an "action against the [FSLIC] to enforce a claim for payment of insurance upon an insured account of an insured institution in default" must be brought within three years of the default or within two years of the FSLIC's denial of the claim. 12 U.S.C. § 1728(c) (statute of limitations). Section 1821(f) for claims against the FDIC and § 1787(c)(1) for claims against the NCUAB do not contain such a statute of limitations provision.
[10] Contra Morrison-Knudsen Co., Inc. v. CHG International, Inc., 811 F.2d 1209 (9th Cir.1987) (Ninth Circuit disagrees with and rejects Hudspeth. Held: FSLIC does not have the power to adjudicate creditor claims brought against it as the receiver of a failed thrift institution.)
[11] The Court concludes that organizations, such as the three cemetery companies, were not eligible for membership in Zionic by virtue of paragraph 2. Thus, the Court will not extensively address the NCUAB's contention that the three cemetery companies' tenuous affiliation to NFI does not satisfy the "affiliated" requirement of paragraph 2. On this point, the Court states only that, applying a normal summary judgment standard, the NCUAB has not shown that the three cemetery companies were not affiliated to NFI. But cf. infra footnote 13.
[12] NYDF and CP also had the same mailing address and telephone number as NFI and Zionic. MI had the same telephone number, but its mailing address was: "P.O. Box 835, Bridgeton, MO. 63044." (Defendant's Exhibit 4).
[13] If the Court is incorrect as to the appropriate standard of review of the NCUAB's insurance claim decisions, the Court here expressly concludes that the NCUAB's decision to deny plaintiff's insurance claims was not arbitrary, capricious, or an abuse of discretion. The NCUAB's interpretation of paragraph 2 not to include organizations was not arbitrary, capricious, or an abuse of discretion. The NCUAB's determination that the three cemetery companies' tenuous affiliation to NFI (NFI owned one-half of the stock of NHC; NHC owned the three cemetery companies) does not satisfy the "affiliated" requirement of paragraph 2 was not arbitrary, capricious, or an abuse of discretion. But cf. supra footnote 11. Thus, the Court here expressly concludes that, after arbitrariness review, the NCUAB is entitled to summary judgment on plaintiff's complaints.